**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

———————————————————  :
                                                          :
**Richard A. Rowe and Nicholas R. Dagostino,**  :
**individually and on behalf of themselves and**  :          **CIVIL ACTION**
**all others similarly situated,**  :
                                                          :          **CLASS ACTION COMPLAINT**
          **Plaintiffs,**  :
                                                          :
      **v.**  :          **Case No. 06-1810 (RBK)**
                                                          :
**E. I. DuPont De Nemours and Company,**  :
                                                          :          **JURY TRIAL DEMANDED**
          **Defendant.**  :
———————————————————:

## CIVIL ACTION COMPLAINT – CLASS ACTION

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs, individually and on behalf of a class of other people similarly situated, state as follows for their Class Action Complaint against defendant, E. I. DuPont De Nemours and Company (hereinafter referred to as "DuPont").

## NATURE OF ACTION

1.      This is a civil class action for declaratory relief, injunctive relief, equitable relief, compensatory and punitive damages, including medical monitoring, and costs incurred and to be incurred by plaintiffs and the other class members for bodily injury, emotional distress and property damage arising from the intentional, knowing, reckless and negligent acts and omissions of DuPont in connection with the contamination of human drinking water supplies used by the plaintiffs and other class members. The contamination occurred in connection with DuPont's manufacturing, production, processing, recycling, use, release, discharge and/or

disposal of perfluorinated materials including C-4 through C-16, fluoropolymers and fluorotelomers such as PFOA, DFS-1, DFS-2, FC-143, Zonyl, TSBA, and FS-62 (hereinafter "PFCs") at and/or otherwise attributable to, DuPont's Chambers Works plant (the "Chambers Works Plant") in Salem County, New Jersey.  This action is brought for individual claims and pursuant to Rule 23 of the Federal Rules of Civil Procedure, as a class action on behalf of the named plaintiffs and on behalf of all individuals who have consumed human drinking water for at least one year from a source of drinking water contaminated with more than 0.05 ppb of any one PFC or any combination of PFCs attributable to releases from the Chambers Works Plant (hereafter, such water sources are referred to as a "Contaminated Source").

## JURISDICTION AND VENUE

2.     At the time of the commencement of this action, the following statements of fact are true:

     a.   Plaintiff Richard A. Rowe resides at 59 West Harmony Street, Penns Grove, New Jersey;

     b.   Plaintiff Richard A. Rowe intends to continue to reside at said address in the State of New Jersey;

     c.   Plaintiff Richard A. Rowe holds a drivers license in the State of New Jersey;

     d.   Plaintiff Richard A. Rowe is registered to vote in the State of New Jersey; and

     e.   Plaintiff Richard A. Rowe is employed in the State of New Jersey.

3.     Plaintiff Richard A. Rowe is a citizen of the State of New Jersey.

4.     At the time of the commencement of this action, the following statements of fact are true:

    a.  Plaintiff Nicholas Dagostino resides at 291 Justice Drive, Carneys Pont, New Jersey;

    b.  Plaintiff Nicholas Dagostino intends to continue to reside at said address in the State of New Jersey;

    c.  Plaintiff Nicholas Dagostino holds a drivers license in the State of New Jersey;

    d.  Plaintiff Nicholas Dagostino is registered to vote in the State of New Jersey; and

    e.  Plaintiff Nicholas Dagostino is employed in the State of New Jersey.

5.    Plaintiff Nicholas Dagostino is a citizen of the State of New Jersey.

6.    DuPont is a Delaware corporation with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19898.

7.    This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. § 1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorney's fees and is between citizens of different states.  Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions and damages giving rise to the claims outlined herein occurred in the District of New Jersey.

## REPRESENTATIVE CLASS PLAINTIFFS

8.    Plaintiff, Richard A. Rowe, is currently a resident of Salem County, New Jersey, and has consumed for at least one-year water from a Contaminated Source.

9.    Plaintiff, Nicholas R. Dagostino, is currently a resident of Salem County, New Jersey, and has consumed for at least one-year water from a Contaminated Source.

10.    The proposed class would include all individuals who have consumed for at least one-year water from a Contaminated Source.

## GENERAL ALLEGATIONS

11.    DuPont owns and operates the Chambers Works Plant.

12.    For many decades, the Chambers Works Plant has produced, processed, synthesized, salvaged, recycled, used, discharged and/or disposed of one or more PFCs.

13.    The 3M Company began producing one or more PFCs in the late 1940s.

14.    By the early 1950s, DuPont was purchasing at least one PFC (PFOA) manufactured by 3M for use by DuPont in its Teflon®-related manufacturing operations at DuPont's Washington Works Plant located along the Ohio River in West Virginia.

15.    By the 1950s, DuPont also was manufacturing its own range of PFCs, including materials referred to as "Telomers," many of which were produced at DuPont's Chambers Works Plant in New Jersey and sold using the "Zonyl" trade name.

16.    In 1976, an article was published in which the authors claimed to have found organic fluorine in human blood plasma obtained from blood banks in five cities in the United States, and the authors referenced certain PFCs as a potential source of the organic fluorine found in the human blood.

17.    In 1976, DuPont's medical director discussed with 3M's medical director the finding of organic fluorine in general population blood bank supplies, and DuPont performed a search for all published literature referencing the existence of organic fluorine in human blood and sampled employee urine for organic flourine.

18.    In May 1978, 3M notified DuPont that 3M had detected elevated levels of organic fluorine in the blood and/or urine of 3M employees exposed to certain PFCs manufactured at a 3M manufacturing plant.

19.   After obtaining information from 3M that elevated levels of organic fluorine were found in the blood of 3M workers exposed to certain PFCs, DuPont initiated steps to evaluate whether DuPont's PFC workers also had elevated levels of organic fluorine in their blood, and to determine whether such organic fluorine had contributed to any adverse health effects.

20.   As part of DuPont's efforts to evaluate whether its PFC workers had elevated organic fluorine levels in their blood and whether those workers were possibly suffering any adverse health effects attributable to that exposure, DuPont arranged for the sampling and analysis of blood from certain DuPont employees with potential exposure to certain PFCs manufactured at DuPont's Chambers Works facility, including certain DuPont workers exposed at the Chambers Works Plant to DuPont's Telomer A, Telomer B, TBA, and/or Zonyl products (the "Exposed Chambers Works Employees"), arranged for sampling of the air in the Chambers Works Plant for certain PFCs, and initiated steps to review the medical records for the Exposed Chambers Works Employees.

21.   By December 1978, DuPont's evaluation of the medical records for the Exposed Chambers Works Employees indicated a possible effect on the liver on those employees.

22.   By October 1979, DuPont's analysis of blood samples taken from the Exposed Chambers Works Employees indicated that the average level of organic fluorine in the blood of those workers was 150 parts per billion (ppb) (with results as high 370 ppb), when the average level of organic fluorine reported by 3M at the time to be present in the blood of the "general population" was approximately 20 ppb.

23.   By March 1979, DuPont's evaluation of the health of its Exposed Chambers Works Employees indicated that those workers had significantly higher incidences of allergic, endocrine, and metabolic disorders and disorders of skin and cellular tissue when compared to

workers who were not so exposed, and that the number of Exposed Chambers Works Employees with abnormal liver function tests was notably higher in the exposed group than in the non-exposed group of workers.

24.     After finding elevated levels of organic fluorine in Exposed Chambers Works Employees and unexplained health effects among those workers, DuPont stopped its targeted PFC blood monitoring program at the Chambers Works by July of 1979, and DuPont did not advise the Exposed Chambers Works Employees that their blood results or health records were unusual in any way.

25.     In 1981, 3M advised that PFOA appeared to cause defects in the eyes of baby rats exposed to PFOA, and DuPont became concerned that PFOA might cause similar birth defects in humans.

26.     In response to 3M's rat eye defect data for PFOA, DuPont temporarily removed certain female employees from jobs that carried a potential risk of exposure to PFOA and monitored the blood and pregnancies of certain of those workers.  Five of seven PFOA-exposed women gave birth; and of those five, two of the women gave birth to babies with birth defects – one an "unconfirmed" tear duct defect, and one confirmed with a nostril and eye defect (among other severe facial defects).

27.     Rather than report the human birth defect data to USEPA, DuPont and 3M advised USEPA that a later rat study found no birth defects, and DuPont returned its female employees to jobs that carried a risk of PFOA exposure.

28.     DuPont also made the decision not to report to the United States Environmental Protection Agency ("USEPA") its finding of elevated organic fluorine in the blood of its workers exposed to certain PFCs (and any of the possibly adverse associated health effects noted among

those workers) based on its view that publication of the article in 1976 referencing the potential presence of organic fluorine in human blood had been sufficient to put USEPA on notice of the widespread human exposure issue.

29.     DuPont became aware by at least 1984 that the PFOA it had been purchasing from 3M and using in its manufacturing operations at its Washington Works Plant in West Virginia had been detected in public drinking water supplies for communities near the Plant in West Virginia and Ohio, and that PFOA was likely present in the air outside the Washington Works site fence line.

30.     By 1992, DuPont had obtained sampling data indicating that up to 410 ppb PFOA was in the water being discharged from DuPont's Chambers Works Plant into the Delaware River, with PFOA being detected as high as 310 ppb in the Delaware River water at that time.

31.     By May 1993, DuPont's own sampling indicated that PFOA had been detected as high as 3 ppb "at the New Jersey side" of the Delaware River near DuPont's Chambers Works Plant.

32.     By 1993, DuPont had performed tests to determine the ability of the Chambers Works Plant's wastewater treatment facility to remove PFOA from water, and had determined that the wastewater treatment facility's capability for treating such waste was very limited.

33.     Nevertheless, by 1999, DuPont's Chambers Works Plant began receiving PFOA-contaminated liquid wastes from DuPont's Washington Works Plant in West Virginia in connection with an effort by DuPont to begin recycling the Washington Works Plant's PFOA liquid wastes.

34.     Prior to commencement of the program at the Chambers Works Plant to try to recycle the Washington Works Plant's PFOA-contaminated liquid wastes before discharge of the

liquid to the Delaware River, DuPont analyzed the blood of certain Chambers Works Plant employees for total organic fluorine and PFOA in order to obtain a "baseline" upon which to compare employee blood levels for these materials as the PFOA-recycling project proceeded.

35.     Results obtained by DuPont in 1999 for its "baseline" analysis of Chambers Works employees' blood indicated that, of the employees with detectable organic fluorine and/or PFOA levels in their blood, the average level of organic fluorine was 270 ppb with the average level of PFOA in the blood of such employees being 30 ppb.

36.     In early 2000, a DuPont occupational health official at the Chambers Works Plant recommended creation of a medical surveillance program for all Chambers Works employees exposed to perfluorochemicals, including medical/work histories and blood chemistry profiles, such as liver function tests.

37.     By April 2000, DuPont rejected the recommendation of its own occupational health official for a comprehensive medical surveillance program for perfluorochemical-exposed employees noting that creation of such a program "could have significant repercussions at any of our other sites that handle . . . similar products."

38.     By February 2001, DuPont had obtained follow up results of analysis of the blood of Chambers Works employees involved in the recycling of PFOA liquid wastes at DuPont's Chambers Works Plant and, rather than compare the PFOA blood results to the original "baseline" results from 1999 where the average level of PFOA detected was 30 ppb and the average level of organic fluorine detected was 270 ppb, DuPont changed the detection and reporting limits for those materials and told the Chambers Works employees only that "all of the reported results [for PFOA] were below 100 ppb" and that "all of the results in the follow up study [for organic fluorine] were less than the revised detection limit of" 500 ppb, rendering it

impossible for the employees to know whether their PFOA or organic fluorine blood levels had gone up or down after exposure to the liquid PFOA wastes from DuPont's Washington Works plant.

39.   In August 2001, a class action lawsuit was filed against DuPont in West Virginia State Court alleging that DuPont had contaminated community drinking water supplies with PFOA released from its Washington Works Plant, and that DuPont had failed to disclose such contamination and the resultant human health risks to the residents exposed to the contaminated drinking water.

40.   By August 2003, DuPont had published a report with the West Virginia Department of Environmental Protection (known as the "Groundwater Investigation Steering Team Report") that suggested aerial distribution of PFOA from air emissions at the Washington Works Plant, along with movement of groundwater and/or Ohio River surface water contaminated with PFOA from the Washington Works Plant discharges, may have contributed to the creation of the PFOA contamination in the public and private drinking water supplies located near DuPont's Washington Works Plant.

41.   In September 2003, DuPont released a report entitled "DuPont Telomer Manufacturing Sites: Environmental Assessment Of PFOA Levels In Air And Water" (the "2003 Report"), which confirmed that PFOA also was released into the air from operations and activities at the Chambers Works Plant at levels as high as 0.0036 ug/m3, PFOA was contaminating the groundwater under the Chambers Works Plant at levels as high as 46.6 ppb, and that PFOA was being released into the Delaware River from the Chambers Works Plant at a concentration as high as 194 ppb, resulting in a detection of PFOA in the Delaware River water at a level as high as 0.566 ppb.

42.     As part of its 2003 investigation of PFOA releases from the Chambers Works Plant, DuPont confirmed in its 2003 Report that PFOA had been detected in the water intake for "Salem Canal, designated a drinking water source by the New Jersey Department of Environmental Protection", at a concentration of 0.089 ppb, and that the Chambers Works Plant "withdraws approximately 8 to 10 mgd of water at Mansun Dam."

43.     In a letter to USEPA dated June 23, 2000, DuPont estimated that it had discharged approximately 9500 pounds of PFOA into the Delaware River in 1999 alone, and DuPont estimated that it had dumped approximately 3900 pounds of PFOA into a landfill at the Chambers Works Plant site during 1999 alone.

44.     By 2004, DuPont was aware that levels of PFOA higher than 100 ppb had been detected in the blood of residents near its Washington Works Plant in West Virginia who had been using one of the PFOA-contaminated public water supplies, when the level of PFOA reported to be present in the blood of the "general population" was approximately 5 ppb.

45.     Despite knowledge since at least the 1980s that PFOA emissions and/or releases into the air, groundwater, and surface water from its Washington Works Plant in West Virginia were suspected of contributing to contamination of public and private drinking water supplies near that Plant, and despite knowledge since at least 2003 that PFOA also was being released into the air, groundwater, and surface water from its Chambers Works Plant in New Jersey, DuPont has taken no steps to sample or analyze public or private water near its Chambers Works Plant to determine whether those supplies also are contaminated with PFOA or any other PFC.

46.     Despite knowledge since at least the late 1970s that humans exposed to perfluorochemicals, including PFOA, would accumulate elevated levels of such chemicals in their blood, and despite knowledge since at least 2004 that exposure to even low part per billion

or part per trillion levels of PFOA in community drinking water could result in significantly elevated levels of such chemicals in the blood of the general population drinking that water, DuPont has taken no steps to sample or analyze the blood of individuals living in communities near DuPont's Chambers Works Plant whose drinking water is contaminated with one or more PFCs to determine the level of any PFC in the blood of those individuals.

47.     Recent testing of water wells owned and operated by the Penn's Grove Water Supply Company that supplies public drinking water to the towns of Penns Grove, New Jersey, and Carney's Point, New Jersey, near DuPont's Chambers Works Plant, has revealed the presence of PFOA in that water as high as 0.089 ppb.

48.     As part of a settlement of the 2001 class action brought against DuPont in West Virginia for contamination of public and private drinking water supplies with PFOA released from DuPont's Washington Works Plant, DuPont has agreed to pay for the installation of treatment systems to reduce PFOA contamination in public and private water supplies in Ohio and West Virginia where PFOA had been detected at or above 0.05 ppb.

49.     In conjunction with the settlement of the 2001 class action brought against DuPont in West Virginia for contamination of public and private drinking water supplies with PFOA released from DuPont's Washington Works Plant, DuPont has separately agreed to pay for bottled water for those using public or private water supplies contaminated with 0.05 ppb or more PFOA until such time as the water treatment systems are in place.

50.     As of today's date, DuPont has not offered to provide and/or pay for any treatment of any public or private water supplies near DuPont's Chambers Works Plant that are contaminated with PFOA or any other PFCs attributable to DuPont's Chambers Works Plant, nor has DuPont offered to supply bottled water to those using the contaminated water in New Jersey.

51.     As part of the settlement of the 2001 class action lawsuit brought against DuPont in West Virginia involving contamination of public and private drinking water supplies with PFOA attributable to releases from DuPont, DuPont has agreed that medical monitoring of impacted community residents is appropriate and should be paid for by DuPont if there is a probable link between such residents' exposure to PFOA and any serious latent human disease, including birth defects.

52.     The Chambers Works Plant is located next to the Delaware River and is adjacent to several populated municipalities.

53.     The Chambers Works Plant is comprised of numerous operating units, including a chemical manufacturing plant, loading and unloading areas, materials storage areas, one or more landfills or other waste disposal areas, and a wastewater treatment plant. During the course of its operations at the Chambers Works Plant, DuPont has allowed, caused, and/or otherwise permitted and is continuing to so allow, cause, and permit release of one or more PFCs from the Chambers Works Plant into the waters that are and have been used for human drinking purposes.

54.     PFCs are produced synthetically and do not occur naturally in the environment.

55.     The manufacturing and recycling processes for PFCs are complicated.  There are hundreds of steps associated with the manufacturing and/or recycling of PFC-related products. Releases of PFCs into the environment can occur at each stage of the process unless due care is exercised.  PFCs can be released when the chemical is synthesized, and continue during incorporation into a product, during distribution of the product, during the recycling of the product, during use of the product, and during disposal.

56.     During the production, synthesis, recycling and disposal of PFCs, due care must be exercised at all times to avoid the release or discharge of PFCs into the environment.

57.     Once released, PFCs are persistent in the environment.  The destruction of certain PFCs only occurs through high temperature incineration.

58.     Certain PFCs are not known to ever break down in water, soil, air, or the human body.

59.     One or more PFCs are bioretentive substances.

60.     One or more PFCs are bioaccumulative substances.

61.     One or more PFCs are biopersistent substances.

62.     One or more PFCs are known animal carcinogens.

63.     One or more PFCs are multisite carcinogens in rats.

64.     One or more PFCs are hepatotoxic (a toxin in the liver) to animals.

65.     One or more PFCs are associated with developmental effects in animals.

66.     On information and belief, one or more PFCs attributable to releases from the Chambers Works Plant have contaminated the air, soil, biota, surface water (including the Delaware River), groundwater, sediments and public and/or private human drinking water supplies/sources located on or near the Chambers Works Plant.

67.     One or more PFCs are subject to atmospheric dispersion associated with the prevailing wind patterns.  This dispersion results in human exposure both on-site and off-site of the Chambers Works Plant.

68.     Because PFCs are not naturally occurring substances, all PFCs found in human blood serum and/or plasma are attributable to human activity.

69.     USEPA began reviewing the toxicity of certain PFCs, including PFOA after 3M began disclosing additional information to USEPA in the late 1990s that revealed potential developmental, reproductive, and carcinogenic effects of certain PFCs and disclosed that certain

PFCs were being found in the blood of the general U.S. population and in the blood of wildlife worldwide.

70.     By at least May 2000, DuPont had learned that 3M, the manufacturer of the PFOA material DuPont had been using, had decided to stop manufacturing and selling PFOA, based upon concerns associated with the bio-persistence and relative toxicity of PFOA.

71.     Despite knowledge of the same bio-persistence and toxicity concerns known to 3M relating to the use of PFOA and its release into the environment, DuPont has refused to stop using PFOA or making other PFCs that might degrade into, form, or otherwise result in the presence of PFOA and other PFCs in the environment.  In fact, DuPont has begun the direct manufacture of PFOA at its own plant in Fayetteville, North Carolina.

72.     EPA has noted that PFOA presents developmental and reproductive risks to humans.

73.     In February 2006, EPA's Science Advisory Board's PFOA Review Panel ("SAB Panel") issued a report recommending that EPA revise its description of PFOA's human cancer relevance to reflect the fact that PFOA meets the criteria for characterization as a "likely" human carcinogen.

74.     The SAB Panel has indicated that they would recommend, based on animal studies, limited human occupational epidemiological studies, and other scientific data, that EPA's PFOA risk assessment address a variety of potential adverse health effects in humans, including liver, testicular, pancreatic, and mammary or breast cancer; liver histopathology other than liver cancer; alteration of lipid metabolism; immunotoxicity and effects on hormonal systems; developmental effects; and neurotoxicity and effects on the behavioral function.

75.     Upon information and belief, DuPont has known and/or suspected for many years that releases of one or more PFCs from its Chambers Works Plant have contaminated (and continue to contaminate) the drinking water utilized by the Plaintiffs and the other class members.

76.     In spite of its knowledge, which was far superior to that of Plaintiffs and the other class members, DuPont negligently, carelessly, wrongfully, recklessly and/or intentionally has failed to advise and/or warn citizens living and/or working in the area surrounding the Chambers Works Plant about the presence of one or more PFCs in their drinking water and failed to fully and accurately disclose the true toxicity risks and bioaccumulation risks associated with those chemicals.

77.     DuPont negligently, carelessly, wrongfully, recklessly and/or intentionally has failed to take appropriate steps to try to reduce the levels of PFCs in the drinking water consumed by the Plaintiffs and the other class members.

78.     Since approximately 1979, DuPont has sampled the blood/serum and/or plasma of select employees at the Chambers Works Plant to try to determine the level of their exposure to one or more PFCs.  However, DuPont has not sampled (or offered to sample) the blood of non-employees who have ingested drinking water from a Contaminated Source.

79.     The releases of one or more PFCs from the Chambers Works Plant have adversely impacted and continue to adversely impact the value of those real properties in which Plaintiffs and the other class members have an ownership or other possessory interest.

80.     The releases of one or more PFCs from the Chambers Works Plant have possibly and/or have made and/or continue to make Plaintiffs and the other class members physically ill and/or otherwise physically harmed (including, but not limited to blood and/or bodily

contamination via PFCs and/or sub-cellular damage), and/or have caused and continue to cause associated emotional and mental stress, anxiety, and fear of current and future illnesses, including but not limited to, fear of significantly increased risk of cancer and other disease, among Plaintiffs and the other class members.

81.     Each person who has consumed, ingested, will consume or ingest water from a Contaminated Source has been, or will be, at an increased risk for real and present physical and biologic injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage).

82.     One or more PFCs are hazardous and/or toxic substances.

83.     There is a probable link between exposure to one or more PFCs and subclinical or subcellular injury and/or serious latent human disease.

84.     Each person who has and/or will consume water from a Contaminated Source for at least one year has and/or will have a significantly increased risk of contracting one or more serious latent diseases.

85.     The increased risk of serious latent disease referred in paragraph 84 makes it reasonably necessary for each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

86.     Monitoring procedures exist that make possible the early detection of the latent diseases referred above in paragraph 84.

## CLASS ACTION ALLEGATIONS

87.     This civil action is an appropriate case to be brought and prosecuted as a class action by Plaintiffs against DuPont pursuant to Rule 23 of the Federal Rules of Civil Procedure.

88.     There exists a class of individuals who have consumed drinking water for at least one year from a Contaminated Source.

89.     Because each of the named Plaintiffs have consumed water from a Contaminated Source for at least one year, the named Plaintiffs have claims against DuPont that are typical of the claims of the class members, and the named Plaintiffs will fairly and adequately protect the interests of the class with respect to the appropriate common issues of fact and law.

90.     The named Plaintiffs have hired counsel who are competent to prosecute this action for and on behalf of the Plaintiffs and the class.

91.     The prosecution of this civil action by all Plaintiffs in separate actions: (1) would create a risk of inconsistent or varying adjudications with respect to individual members of the class; (2) could, as a practical matter, be dispositive of interests of other members of the class who were not parties to the separate actions; and (3) may substantially impair or impede the Plaintiffs' ability to protect their interests.

92.     DuPont has acted or refused to act on grounds generally applicable to the class making declaratory, injunctive and equitable relief appropriate for the whole class.

93.     The class includes thousands of persons and is therefore so numerous that it would be impracticable to join all of them as named Plaintiffs in this action.

94.     There are questions of law and fact common to the members of the class that predominate over any questions affecting only individual class members, including, but not limited to the following:

> a.  Whether the Plaintiffs and other class members are entitled to medical monitoring relief.

b.   Whether DuPont is liable to the Plaintiffs and the class for damages proximately caused by a continuing trespass of their bodies and property.

c.   Whether DuPont is liable to the Plaintiffs and the class for damages proximately caused by the Defendant's creation of a private nuisance.

d.   Whether DuPont is liable to the Plaintiffs and the class for damages proximately caused by DuPont's negligence.

e.   Whether DuPont committed a battery on Plaintiffs and the class and is thereby liable for compensatory relief.

f.   Whether the DuPont is liable to the Plaintiffs and the class for punitive damages.

g.   Such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

95.    Plaintiffs will fairly and adequately protect the interests of the class because the interests of Plaintiffs as class representatives are consistent with those of the members of the class.

96.    Prosecution of a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

97.    The interests of members of the class, as to common questions of law and fact, in individually controlling the prosecution of separate actions do not outweigh the benefits of a class action as to those issues.

98.    Any difficulties in management of this case as a class action are outweighed by the benefits of a class action with respect to disposing of common issues of law and fact as to the large number of litigants, and it is desirable to concentrate the litigation in one forum for the management of this civil action.

## FIRST COUNT

## NEGLIGENCE

99.    Plaintiffs and the other class members incorporate the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

100.    In connection with its operation of the Chambers Works Plant, DuPont has had and continues to have a duty to operate and manage the Chambers Works Plant and its related wastes in such a way as to not create a nuisance or condition causing any injury or damage to human health or the environment.

101.    DuPont breached its duty of care by negligently operating and managing the Chambers Works Plant and conducting other operations and activities at the Chambers Works Plant in such a manner as to negligently cause, permit, and/or allow the release of one or more PFCs into the environment, thereby contaminating the drinking water of Plaintiffs and the other class members.

102.    DuPont's negligent acts and omissions proximately caused and continue to proximately cause damage to Plaintiffs and other class members in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage) and property damage, in addition to creating conditions that are harmful to human health and the environment, for which DuPont is liable, including liability for all appropriate medical monitoring of Plaintiffs and the other class members.

103.    As a proximate result of the aforesaid acts and omissions, DuPont and those acting for and on its behalf and as agents, ostensible agents, employees, conspirators and joint venturers of others, contaminated the environment with one or more PFCs, which were consumed by

Plaintiffs and the class which Plaintiffs seek to represent, and Plaintiffs and the other class members were injured as herein alleged.

104.   The aforesaid acts and omissions of DuPont were negligent, and as a proximate result, Plaintiffs and the class members have suffered and/or will in the future suffer damage in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage), emotional distress, and/or property damage all of a type special and common to members of the class but not common to the general public, for which DuPont is liable, including liability for all appropriate medical monitoring relief required by Plaintiffs and the other class members.

## SECOND COUNT

## GROSS NEGLIGENCE, RECKLESS, WILLFULL AND WANTON CONDUCT

## (CLAIM FOR EXEMPLARY OR PUNITIVE DAMAGES)

105.   Plaintiffs and the other class members incorporate the allegations contained in all prior paragraphs of this Complaint as if fully stated herein.

106.   At all times pertinent hereto, the conduct of DuPont in causing, permitting, and allowing the release of one or more PFCs into the environment, thereby contaminating the drinking water of Plaintiffs and the other class members was more than simple negligence, momentary thoughtlessness, inadvertence, or error of judgment on the part of DuPont.  Instead, DuPont's conduct constitutes such an entire want of care and conscious indifference to the rights, welfare, safety, and health of Plaintiffs and the other class members such that DuPont's acts constitute gross negligence.

107.    DuPont's grossly negligent acts and omissions proximately caused and continue to proximately cause damage to Plaintiffs and other class members in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage) and property damage, in addition to creating conditions that are harmful to human health and the environment.

108.    DuPont's conduct involved deliberate acts or omissions with knowledge of a high degree of probability of harm to the plaintiffs and other class members and a reckless indifference to their welfare.

109.    DuPont's conduct demonstrated a willful and wanton, malicious and reckless disregard of the rights of the Plaintiffs and other class members so as to warrant the imposition of punitive damages.

## THIRD COUNT

## PRIVATE NUISANCE

110.    Plaintiffs and the other class members incorporate herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

111.    DuPont's acts and omissions with respect to the releases of one or more PFCs caused and/or continue to cause a material, substantial, and/or unreasonable interference with Plaintiffs' and the other class members' use and/or enjoyment of their properties, and has materially diminished and/or continues to diminish the value of such properties.

112.    DuPont's material, substantial, and/or unreasonable interference with the use and/or enjoyment of Plaintiffs' and the other class members' properties and/or continuing substantial and/or unreasonable interference with such use and/or enjoyment constitutes a continuing private nuisance.

113.   DuPont's creation and/or continuing creation of a continuing private nuisance proximately caused and/or continues to proximately cause damage to Plaintiffs and the other class members in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage), emotional distress, and/or property damage all of a type special and common to members of the class but not common to the general public, for which DuPont is liable, including liability for all appropriate medical monitoring relief required by Plaintiffs and the other class members.

## FOURTH COUNT

## PAST AND CONTINUING TRESPASS

114.   Plaintiffs and the other class members incorporate herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

115.   DuPont's intentional acts and/or omissions have resulted and/or continue to result in the unlawful release and/or threatened release of one or more PFCs at, under, onto, and/or into Plaintiffs' and the other class members' bodies and/or lawfully possessed properties.

116.   The PFCs present on Plaintiffs' and the other class members' properties and/or in their bodies originating from the Chambers Works Plant were at all relevant times hereto, and continue to be, the property of DuPont.

117.   The invasion and presence of the PFCs at, under, onto, and/or into Plaintiffs' and the other class members' properties and/or bodies were and continue to be without permission or authority from Plaintiffs or any of the other class members or anyone who could grant such permission or authority.

118.   The presence and continuing presence of one or more PFCs in Plaintiffs' and the other class members' properties and/or bodies constitute a continuing trespass.

119.   DuPont's past and continuing trespass upon Plaintiffs' and the other class members' properties and/or bodies has proximately caused and/or continues to proximately cause damage to Plaintiffs and the other class members in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage), emotional distress and/or property damage, for which DuPont is liable, including liability for all appropriate medical monitoring of Plaintiffs and the other class members.

## FIFTH COUNT

## PAST AND CONTINUING BATTERY

120.   Plaintiffs and the other class members incorporate herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

121.   DuPont's intentional acts and omissions have resulted and continue to result in the unlawful invasion, contact, and/or presence of one or more PFCs with, onto, and/or into Plaintiffs' and the other class members' bodies.

122.   DuPont's intentional acts and/or omissions were done with the knowledge and/or belief that the invasion, contact, and/or presence of one or more PFCs with, onto, and/or into Plaintiffs' and/or other class members' bodies were substantially certain to result from those acts and/or omissions.

123.   The PFCs that Plaintiffs and other class members have ingested or otherwise been exposed to, or that are present in the bodies of Plaintiffs and the other class members, originating from the Chambers Works Plant were at all relevant times hereto, and continue to be, the property of DuPont.

124.    The invasion, contact, and/or presence of one or more PFCs with, onto, and/or into Plaintiffs' and the other class members' bodies were and continue to be without permission or authority from Plaintiffs or any of the other class members or anyone who could grant such permission or authority.

125.    The presence and continuing invasion, contact, and/or presence of one or more PFCs with, onto, and/or into Plaintiffs' and the other class members' bodies constitute a continuing battery.

126.    DuPont's past and continuing battery upon Plaintiffs' and the other class members' bodies proximately caused and continue to proximately cause damage to Plaintiffs and the other class members in the form of bodily injury (including, but not limited to blood and/or bodily contamination via PFCs and/or sub-cellular damage), emotional distress and other damage, for which DuPont is liable, including liability for all appropriate medical monitoring of Plaintiffs and the other class members.

## SIXTH COUNT

## MEDICAL MONITORING

127.    Plaintiff and the other class members incorporate herein the allegations contained in all prior paragraphs of this Complaint as if fully restated herein.

128.    Each person who has consumed and/or ingested, will consume and/or ingest, for at least one year water from a Contaminated Source, has been or will be, relative to the general population, significantly exposed to one or more PFCs.

129.    One or more PFCs are proven hazardous substances.

130.    There is a probable link between exposure to one or more PFCs and human disease.

131.    Each person who has been or will be significantly exposed to one or more PFCs through the consumption and/or ingestion for at least one year of water from a Contaminated Source has or will have a significantly increased risk of contracting one or more serious latent diseases relative to what would be the case in the absence of such exposure.

132.    The increased risk of serious latent disease described in paragraph 131 makes it reasonably necessary for each person so exposed to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of such exposure.

133.    Monitoring procedures exist that make possible the early detection of the diseases referenced in paragraphs 131-132 above.

134.    As a proximate result of the acts and omissions of DuPont as alleged in this Complaint, Plaintiffs and the class have been and will be greatly annoyed and inconvenienced, have suffered and will suffer fear, humiliation and/or embarrassment and have been and will be otherwise damaged as alleged in this Complaint.

135.    Plaintiffs and the class have no adequate remedy at law and, therefore, medical monitoring and the establishment of a medical monitoring fund are reasonably necessary to pay for medical monitoring.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and each member of the Class have been damaged, and are entitled to damages in an amount to be proven at trial, in an aggregate amount to exceed $5,000,000.00, including compensatory damages, attorneys' fees and costs, and therefore request the following relief:

1.    An order from this Court ordering that this is an appropriate action to be prosecuted as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and

finding that Plaintiffs and their counsel are appropriate representatives and appropriate counsel for the class, and that this action shall proceed as a class action on all common issues of law and fact;

2.      A judgment against DuPont that DuPont is liable to Plaintiffs and the other class members for all appropriate medical monitoring relief in an amount to be determined at trial;

3.      Compensatory and punitive damages in an amount to be determined at trial;

4.      The costs, disbursements and attorneys' fees of this action as provided by law;

5.       Pre-judgment and post-judgment interest;

6.      Appropriate equitable and injunctive relief, includes for providing notice and medical monitoring relief to the Plaintiffs and the class and to abate and/or prevent the release and/or threatened release of one or more PFCs; and

7.      For all other further and general relief, whether compensatory, equitable, or injunctive relief, as this Court may deem just and appropriate.

## **JURY DEMAND**

The Plaintiffs and the other class members demand trial by a jury on all of the triable issues of this complaint.

**LIEBERMAN & BLECHER, P.C.**
**Attorneys for Plaintiffs**


 /s/  Shari M. Blecher

By:     Shari M. Blecher, Esq.
        Stuart J. Lieberman, Esq.
         **LIEBERMAN & BLECHER, P.C.**
        30 Jefferson Plaza
        Princeton, New Jersey 08540
        (732) 355-1311