[06-1810, Dkt. No. 162]
[06-3080, Dkt. No. 162]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

RICHARD A. ROWE, et al.,
individually and on behalf of
themselves and all others
similarly situated,                    Civil No. 06-1810 (RMB)

        Plaintiffs,

    v.

E.I. DUPONT DE NEMOURS AND
COMPANY,

        Defendant.

MISTY SCOTT, on behalf of
herself and all others
similarly situated,                    Civil No. 06-3080 (RMB)

        Plaintiffs,

    v.                              **OPINION**

E.I. DUPONT DE NEMOURS AND
COMPANY,

        Defendant.

APPEARANCES:

Attorneys for Rowe Plaintiffs
    Andrew J. Chamberlain
    Michael George Sinkevich, Jr.
    Shari M. Blecher
    Stuart J. Lieberman
    Lieberman & Blecher, P.C.

```
        10 Jefferson Plaza Suite 100
        Princeton, NJ 08540

Attorneys for Scott Plaintiffs
        Philip Stephen Fuoco
        Joseph A. Osefchen
        The Law Firm of Philip Stephen Fuoco
        24 Wilkins Place
        Haddonfield, NJ 08033

        Leonard H. Niedermayer
        Warren Sharp Jones, Jr.
        Law Office of Warren S. Jones, Jr.
        100 High Street
        P.O. Box 118
        Mount Holly, NJ 08060

        Stephen P. Denittis
        Shabel & Denittis, PC
        5 Greentree Centre
        Route 73 & Lincoln Drive, Suite 302
        Marlton, NJU 08053

Attorneys for Defendant DuPont
        Roy Alan Cohen
        Porzio, Bromberg & Newman, PC
        100 Southgate Parkway
        P.O. Box 1997
        Morristown, NJ 07962
```

**BUMB**, United States District Judge:

## I.   INTRODUCTION

     This matter comes before the Court upon two motions for
class certification filed by the plaintiffs in each case.
Although the Rowe and Scott classes each seek separate
certification, the Court will address both motions together
because they involve nearly identical legal issues.  However,
where necessary, the Court will set forth the differences between
the classes, their claims, and their motions for class

certification.

## II.  FACTUAL BACKGROUND

These cases arise from Defendant E.I. du Pont de Nemours and Company's ("DuPont") release of certain perfluorinated materials, known as "C-8" or "PFOA", from its Chambers Works Plant in Salem County, New Jersey.  (Rowe Sec. Am. Compl. ¶ 1; Scott Sec. Am. Compl. ¶ 14).  Plaintiffs[1] allege that the PFOA released from the Chambers Works Plant has contaminated the drinking water supply of the Penns Grove Water Supply Company ("PGWS").[2]  (Rowe Sec. Am. Compl. ¶ 1; Scott Sec. Am. Compl. ¶ 14).  Specifically, Plaintiffs claim that the levels of PFOA detected in the PGWS water supply are higher than the .04 parts per billion ("ppb") preliminary safety guideline established by the New Jersey Department of Environmental Protection ("NJDEP").  (Rowe Sec. Am. Compl. ¶¶ 59, 60; Scott Sec. Am. Compl. ¶¶ 11, 12).

As described by the NJDEP, "PFOA is a synthetic (man-made) chemical used in the manufacture of several commercially important products."  (Determination of Perfluorooctanoic Acid (PFOA) in Aqueous Samples, Final Report, NJDEP Division of Water

---

[1] "Plaintiffs" refers to both the Rowe Plaintiffs and the Scott Plaintiff (which are defined _infra_ at 5 and 7).

[2] Rowe Plaintiffs allege that the release of C-8 has also contaminated the drinking water of certain private residential wells in the Penns Grove area. (_See_ Rowe Motion for Cert. at Ex. A).

Supply (January 2007) at 1, DuPont Opp., Ex. B8).  It is "very persistent in the environment and has been found at very low levels both in the environment and in the blood of the general U.S. population."  (Id.).

DuPont has used PFOA in its manufacturing operations at its Chambers Works plant since the 1950s.  (Rowe Sec. Am. Compl. ¶ 27).  Specifically, DuPont has created PFOA "as an unintended by-product in trace quantities as a result of certain chemical reactions in the various processes for manufacturing fluorotelemor-based products."  (DuPont Responses to Rowe Interrogs. 3-8, Ex. 101 to Blecher Aff. in support of Rowe Motion (hereinafter "First Blecher Aff.")).  As a result of these operations, DuPont has released PFOA from its Chambers Works plant into the surrounding air and water.  (See DuPont Responses to Rowe Requests for Admissions 6-11, Ex. 99 to First Blecher Aff.).  Recent testing of the PGWS water wells has revealed PFOA levels as high as .190 ppb.  (Rowe Sec. Am. Compl. ¶ 59).

At this point, the human health effects of PFOA appear to be uncertain.  However, some studies have shown that exposure to PFOA may cause adverse health effects, such as liver disease, cancers, and cholesterol abnormalities.  (See Rowe Motion at 14; Rowe Reply at 3, n. 7; Supplemental Expert Report of David G. Gray, Ph.D., dated Nov. 4, 2008, ("Gray Report") Rowe Hearing Ex. 9; Second Supplemental Expert Report of Barry S. Levy, M.D.,

M.P.H. ("Levy Report"), Ex. 56 to First Blecher Aff.).
Additionally, the evidence indicates that PFOA is biopersistent
and bioaccumulative, meaning that it is eliminated very slowly
from the blood and, thus, will accumulate in an exposed person's
blood over time.  (See Gray Report at 23-24; Levy Report at 8).
Given these concerns, the NJDEP conducted its own research and
ultimately recommended that ".04 ppb be used as preliminary
health-based guidance for PFOA in drinking water."[3]  (NJDEP Memo
re: Guidance for PFOA in Drinking Water at Pennsgrove Water
Supply Company ("NJDEP Memo"), DuPont Opp., Ex. B18).


**III.  PROCEDURAL BACKGROUND**

   **A.  Rowe Class**

   On April 18, 2006, Richard Rowe, Nicholas Dagostino, Mary
Carter, Michelle Tomarchio, Regina Trout, Allen Moore, Marva
Johnson, Catherine Lawrence, and Kathleen Lemke (the "Rowe
Plaintiffs") filed a class action complaint against DuPont in
this Court.  The Rowe Plaintiffs filed an Amended Complaint on
April 28, 2006, and a Second Amended Complaint on February 27,
2007 [Dkt. No. 27].  The Second Amended Complaint contains six
counts against DuPont:  (1) negligence; (2) gross negligence,

---

[3] The Court notes that the NJDEP's preliminary guidance
level of .04 ppb is not an official, legally binding regulation
because it has not gone through the regulatory vetting process.
(See hearing Tr. at 166:9-10).

reckless, willful and wanton conduct; (3) private nuisance; (4) past and continuing trespass; (5) past and continuing battery; and (6) medical monitoring.  The Rowe Plaintiffs seek relief in the form of medical monitoring, compensatory and punitive damages, attorneys' fees, pre-judgment and post-judgment interest, and appropriate equitable and injunctive relief including "providing notice and medical monitoring relief to the Plaintiffs and the class and to abate and/or prevent the release and/or threatened release of [PFOA]."  (Rowe Sec. Am. Compl. at 31).

After a lengthy discovery period, the Rowe Plaintiffs filed the present motion for class certification on April 30, 2008. [Dkt. No. 162].

### B.  Scott Class

The Scott class action was originally filed against DuPont in the Superior Court of New Jersey, Chancery Division, Salem County, on June 16, 2006, by former Plaintiff Donald Coles. DuPont removed the action to this Court on July 7, 2006, and the Rowe and Scott actions were then consolidated for discovery purposes only on September 25, 2006.  [Dkt. No. 26].  On January 22, 2007, Plaintiff Donald Coles filed an Amended Complaint adding a second named Plaintiff, Misty Scott, to the class action complaint.  [Dkt. No. 36].  On April 19, 2007, the Coles/Scott

Plaintiffs filed a motion for class certification.  [Dkt. No. 54].  After a hearing on May 15, 2007, this Court denied that certification motion as premature.  [Dkt. No. 69].

After several months of discovery, Plaintiff Coles filed a motion for voluntary dismissal on August 16, 2007.  [Dkt. No. 92].  Plaintiff Coles was subsequently dismissed from the case on September 24, 2007.  Ms. Scott, the sole remaining named Plaintiff (the "Scott Plaintiff"), filed a Second Amended Complaint on behalf of the proposed class on Oct 18, 2007 [Dkt. No. 123].  The Second Amended Complaint contains six counts against DuPont:  (1) medical monitoring; (2) strict liability; (3) private nuisance; (4) public nuisance; (5) negligence; and (6) a violation of the New Jersey Environmental Rights Act.  The Scott Plaintiff seeks relief in the form of abatement, installation of community-wide filtration systems, medical monitoring, "damages incurred as a result of the conduct alleged herein, to include pre-judgment and post-judgment interest," and attorneys' fees.  (Scott Sec. Am. Compl. at 16-17).  The Scott Plaintiff filed the present motion for class certification on April 30, 2008.  [Dkt. No. 162].

### C.  Certification Hearing

After reviewing the parties' submissions, the Court ordered oral argument and requested that the parties present their expert

witnesses for questioning by the Court.  Accordingly, on November 10 and 20, 2008, the Court heard argument from counsel as well as the testimony of Dr. David Gray and Dr. Barry Levy (experts for the Rowe Plaintiffs), and Dr. Philip Guzelian (expert for DuPont).  The Scott Plaintiff did not present any expert at the certification hearing.

## IV.   LEGAL STANDARD

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure.  In order to be certified, "a class must satisfy the prerequisites of Rule 23(a) and the 'parties seeking certification must also show that the action is maintainable under Rule 23(b)(1), (2), or (3).'"  Barnes v. American Tobacco Co., 161 F.3d 127, (3d Cir. 1998) (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).  The party seeking class certification bears the burden of proving that each of the requirements under Rule 23 has been met.  Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

The district court must perform "a rigorous analysis" to satisfy itself that the prerequisites of Rule 23 have been met. Beck v. Maximus, Inc., 457 F.3d 291, 297 (3d Cir. 2006). However, ultimately, the court has discretion under Rule 23 to certify a class.  Id.  Moreover, in the Third Circuit, courts are instructed to give Rule 23 a liberal construction.  Eisenberg v.

Gagnon, 766 F.2d 770, 785 (3d Cir. 1985) ("the interests of justice require that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action").

In addition to the requirements of Rule 23(a) and (b), part (c) of Rule 23 states that any certification order entered by the Court must "define the class and the class claims, issues, or defenses..." Fed. R. Civ. P. 23(c)(1)(B) (emphasis added). Specifically, the district court's certification order must include "a clear and complete summary of those claims, issues or defenses subject to class treatment." Wachtel v. Guardian Life Ins. Co. of America, 453 F.3d 179, 184 (3d Cir. 2006). In Wachtel, the Third Circuit noted that "current practice often falls short of that standard." Id. at 185. Specifically, the Court of Appeals stated,

> [a]lthough examples of common claims, issues, or defenses presented by the case may be discussed as part of the court's commonality, typicality, or predominance analysis, certification orders are most often devoid of any clear statement regarding the full scope and parameters of the claims, issues or defense to be treated on a class basis as the matter is litigated.

Id. at 185.

To avoid this common pitfall, a district court must set forth a clear and complete summary of the claims, issues or defenses subject to class treatment. However, "a court cannot do so in a vacuum - engaging in superficial analysis of facts and

issues and identifying which facts and issues appear to be, broadly speaking, 'common' versus 'individual.'"  Hohider v. United Parcel Serv., Inc., 243 F.R.D. 147, 185-86 (W.D. Pa. 2007).  Instead, a court must scrutinize "the Rule 23 certification requirements in light of the specific legal claims at issue in the case and what adjudication of those claims would require."  Id. at 186 (emphasis added).


**V.  ANALYSIS**

　　**A.  Plaintiff's Claims**

In this case, neither the Rowe Plaintiffs nor the Scott Plaintiff have offered any analysis to assist this Court in setting forth the actual claims, issues, or defenses that are subject to common proof, with the exception of medical monitoring.  It seems that both potential classes have focused all their attention on the medical monitoring aspect of the case and completely ignored the other claims listed in their complaints:  negligence, nuisance, trespass, battery, strict liability, and the New Jersey Environmental Rights Act. Despite the abundance of paper they have submitted, Plaintiffs have failed to provide any analysis of these claims.  Although Plaintiffs are not required to prove the underlying merits of their claims at this juncture, they are at least required to show that these claims are subject to common proof.  This they have

not done.  Handicapped by Plaintiffs' failure to address these claims, the Court is unable to perform a rigorous analysis of them, as it must.  Accordingly, the Court will deny certification on these claims without prejudice and discuss only the medical monitoring issue and whether class treatment is proper as to that issue.[4]

A claim for medical monitoring "seeks to recover the cost of periodic medical examinations intended to monitor plaintiffs' health and facilitate early diagnosis and treatment of disease caused by plaintiffs' exposure to toxic chemicals."  Ayers v. Twp. of Jackson, 106 N.J. 557, 599 (1987).  It is appropriate where a plaintiff "exhibits no physical injury, but nevertheless requires medical testing as a proximate result of defendant's negligent conduct."  Player v. Motiva Enterprises, LLC, 2006 WL 166452 at *9 (D.N.J. Jan. 20, 2006).

---

[4] The Court notes that both the Rowe Plaintiffs and the Scott Plaintiff have listed medical monitoring in their complaints as both a claim and a form of relief.  Whether medical monitoring is more properly understood as a cause of action or an item of damages remains unanswered.  A review of the Ayers decision and its progeny sheds little light on this issue.  See, e.g., Ayers v. Twp. of Jackson, 106 N.J. 557, 606 (1987) ("we hold that the cost of medical surveillance is a compensable item of damages") (emphasis added); but see Theer v. Philip Carey Co., 133 N.J. 610, 627 (1993) (noting "the Ayers cause of action"); Vitanza v. Wyeth, Inc., 2006 WL 462470 at * 8, n. 3 (N.J. Super. 2006) ("Ayers, as clarified by Theer, holds that medical monitoring as a cause of action or remedy...").  Regardless of whether medical monitoring is a claim or a remedy, Plaintiffs have set forth the elements that must be shown to obtain medical monitoring.  Accordingly, the Court will examine each of these elements.

Under New Jersey law, in order to hold DuPont liable for the cost of Plaintiffs' medical monitoring, Plaintiffs must demonstrate,

> through reliable expert testimony predicated upon the significance and extent of exposure to chemicals, the toxicity of the chemicals, the seriousness of the diseases for which individuals are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, that such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

Ayers v. Twp. of Jackson, 106 N.J. 557, 606 (1987).  As the New Jersey Supreme Court further explained, medical monitoring expenses "may only be awarded if a plaintiff reasonably shows that medical surveillance is required because the exposure caused a distinctive increased risk of future injury, and would require a course of medical monitoring independent of any other that the plaintiff would otherwise have to undergo."  Theer v. Philip Carey Co., 133 N.J. 610, 628 (1993).  Thus, in this case, to obtain medical monitoring on a class-wide basis, Plaintiffs must show the following:

(1) class members suffered significant exposure to PFOA;

(2) PFOA is toxic;

(3) the diseases caused by exposure to PFOA are serious;

(4) class members are at a distinctive increased risk of disease due to their exposure to PFOA;

(5) early diagnosis of these diseases is valuable; and

(6) medical monitoring is reasonable, necessary and

12

different than any other monitoring the class members would
otherwise have to undergo.

As discussed above, at the certification stage, Plaintiffs
do not have to prove that they will succeed on each of these
elements.  Rather, to warrant class certification for purposes of
medical monitoring, Plaintiffs must show that these elements can
be proven on a class-wide basis.


**B.  Rule 23(a) Requirements**

Rule 23(a) contains four requirements: (1) numerosity; (2)
commonality; (3) typicality; and (4) adequacy of representation.[5]
The Court will discuss each of these in turn with respect to
Plaintiffs' requests for medical monitoring.

**1.  Numerosity**

The numerosity element requires that the class be "so
numerous that joinder of all members is impracticable."  Fed. R.
Civ. P. 23(a).  Here, the proposed Rowe class definition covers
thousands of residential PGWS water customers and will include
approximately 14,000 to 15,000 people in total.  (Rowe Motion at

---

[5] The exact language of Rule 23(a) provides:  "One or more
members of a class may sue or be sued as representative parties
on behalf all only if (1) the class is so numerous that joinder
of all members is impracticable, (2) there are questions of law
or fact common to the class, (3) the claims or defenses of the
representative parties are typical of the claims or defenses of
th class, and (4) the representative parties will fairly and
adequately protect the interests of the class."  Fed. R. Civ. P.
23(a).

35; <u>see also</u> Nov. 10, 2008 Hearing Tr. 19:4-9).  Similarly, the
proposed Scott class numbers over 10,000 people.  (Scott Motion
at 27).  DuPont does not dispute the numerosity of either class.
Although there is no minimum number required, "generally if the
named plaintiff demonstrates that the potential number of
plaintiffs exceeds 40, the first prong of Rule 23(a) has been
met."  <u>Stewart v. Abraham</u>, 275 F.3d 220, 226-27 (3d Cir. 2001).
Given the evidence presented in this case, the Court finds that
both the Rowe Plaintiffs and the Scott Plaintiff have satisfied
the numerosity requirement.

### 2.  Commonality

The second prerequisite is commonality, which requires that
there be "questions of law or fact common to the class."  Fed. R.
Civ. P. 23(a).  This does not mean that all the factual and legal
questions in the case must be identical for all proposed class
members.  To the contrary, "[t]he commonality requirement will be
satisfied if the named plaintiffs share at least one question of
fact or law with the grievances of the prospective class."  <u>Baby
Neal</u>, 43 F.3d at 56.  Although the commonality requirement is
often thought to be easily met, the Court notes that "the
commonality barrier is higher in a personal injury damages class
action ... that seeks to resolve all issues, including noncommon
issues, of liability and damages."  <u>Georgine v. Amchem Prods.,
Inc.</u>, 83 F.3d 610, 627 (3d Cir. 1996).

14

Here, Plaintiffs claim that there is "an abundance of common factual and legal issues, including DuPont's tortious release of C-8 from its NJ Plant, contamination of PGWS and private residential well water resulting in significant Class-wide exposure, the hazardous nature of C-8, the increased risk of disease from exposure, the availability of biomonitoring and medical monitoring for diseases linked to C-8 exposure, DuPont's obligation to cease releasing C-8, and DuPont's obligation to remediate the contaminated water supply."  (Rowe Motion at 37; see also Scott Motion at 29).

In response, DuPont argues that there are numerous individual issues which preclude fulfillment of the commonality prerequisite.  For instance, DuPont contends that Plaintiffs cannot show significant PFOA exposure on a class-wide basis because of variations in individuals' water consumption habits and background exposure form other sources, as well as variations in the level of PFOA within the PGWS distribution system (both physically and temporally).  (DuPont Opp. at 41-45).  Similarly, DuPont argues, Plaintiffs cannot demonstrate on a class-wide basis that class members have a distinctive increased risk of disease because of the variations in individuals' susceptibility to PFOA and background risk of disease.  (Id. at 45-49).

While there are individualized issues, as DuPont has pointed out, "the existence of individualized issues in a proposed class

action does not per se defeat commonality." Brooks v. Educators
Mut. Life Ins. Co., 206 F.R.D. 96, 101 (E.D. Pa. 2002) (citing
Johnston v. HBO Film Mgt., Inc., 265 F.3d 178, 191 (3d Cir.
2001). Indeed, the commonality requirement "may be satisfied by
a single common issue..." Baby Neal, 43 F.3d at 56. In this
case, the Court finds that the following issues (relevant to
medical monitoring) are common to all class members: whether
DuPont released PFOA from its Chambers Works Plant in New Jersey
into the surrounding air and water; whether PFOA is hazardous to
human health; and whether medical monitoring is available for the
diseases linked to PFOA exposure. Therefore, Plaintiffs have met
their burden of demonstrating that there is at least one common
issue of law or fact. The commonality prerequisite is satisfied.

### 3. Typicality

Although "'[t]he concepts of commonality and typicality are
broadly defined and tend to merge[,]'" the Court will address
typicality separately. Barnes, 161 F.3d at 141 (quoting Baby
Neal, 43 F.3d at 56). The typicality prerequisite considers
whether "the claims or defenses of the representative parties are
typical of the claims or defenses of the class." Fed. R. Civ. P.
23(a). This inquiry "is intended to assess whether the action
can be efficiently maintained as a class and whether the named
plaintiffs have incentives that align with those of absent class
members so as to assure that the absentees' interests will be

fairly represented." <u>Baby Neal</u>, 43 F.3d at 57.  However, the typicality requirement "does not mandate that all putative class members share identical claims." <u>Barnes</u>, 161 F.3d at 141. Indeed, it is well settled that "'[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.'" <u>Id.</u> (quoting Newberg on Class Actions § 3.15, at 3-78).

Both the Rowe Plaintiffs and the Scott Plaintiff assert that the claims of their respective named plaintiffs are typical of the claims of the entire proposed classes in that they arise from the same course of conduct committed by DuPont and involve the same legal theories.  (Scott Motion at 32; Rowe Motion at 41). More specifically, as contended by the Rowe Plaintiffs, the claims of the named plaintiffs and the entire proposed class "all arise from the releases of C-8 from DuPont's NJ Plaint into the drinking water supply, are based on the same tortious conduct by DuPont, involve the same increased risk of illness, and seek the same equitable and injunctive forms of relief."  (Rowe Motion at 41-42).

DuPont argues that the named plaintiffs' claims are not typical of the class for a number of reasons.  First, Dupont contends that the named plaintiffs' water consumption habits differ from the proposed class members' habits, since Ms. Scott

and most of the Rowe named plaintiffs now drink bottled water as opposed to the unfiltered PGWS water.  (DuPont Opp. at 43-44). Additionally, DuPont claims, the medical monitoring needs of the Rowe named plaintiffs and Ms. Scott are not typical of those of the proposed class members, as all of the Rowe named plaintiffs and Ms. Scott either already manifest one or more of the conditions sought to be monitored or have a family history of such conditions.  (Id. at 52).  As DuPont argues, "[plaintiffs alleging physical injuries cannot represent uninjured plaintiffs ... because the interests of the two groups are different and conflict."  (Id. at 53 (citing Amchem v. Windsor, 521 U.S. at 626)).  Third, DuPont claims that although the Rowe named plaintiffs "purport to not seek certification of any claims for monetary damages[,]" many of them "have testified that they seek damages for personal injury and property damage from PFOA exposure and all have specifically preserved their rights to bring such claims."  (Id. at 53).  Finally, DuPont asserts that the claims of the Rowe named plaintiffs are at odds with the claims of Ms. Scott, as "[t]he Rowe Named Plaintiffs seek medical monitoring for the same conditions that Ms. Scott has admitted are not attributable to PFOA exposure."  (Id. at 54).

In this Court's view, resolution of the typicality element is similar to that of the commonality element – even though DuPont is correct that there are factual differences among the

18

named plaintiffs and the proposed class members, such differences
do not overcome the facts that all plaintiffs' medical monitoring
claims arise from the same course of conduct by DuPont and are
based on the same legal theory (i.e., an <u>Ayers</u> claim/remedy).
Accordingly, applying a liberal interpretation of Rule 23 as it
must, this Court finds that Plaintiffs have satisfied the
typicality requirement.

### 4. Adequacy of Representation

The final prerequisite under Rule 23(a), adequacy of
representation, questions whether "the representative parties
will fairly and adequately protect the interests of the class."
Fed. R. Civ. P. 23(a).  This requirement "depends on two factors:
(a) the plaintiff's attorney must be qualified, experienced, and
generally able to conduct the proposed litigation, and (b) the
plaintiff must not have interests antagonistic to those of the
class."  <u>Hoxworth v. Blinder, Robinson & Co., Inc.</u>, 980 F.2d 912,
923 (3d Cir. 1992) (internal citation omitted).  Unlike the other
requirements, when it comes to adequacy, "[t]he party challenging
representation bears the burden to prove that representation is
not adequate."  <u>In re Prudential Ins. Co. of America Sales
Practices Litigation</u>, 962 F. Supp. 450, 519 (D.N.J. 1997).

Here, there appears to be no dispute as to the qualification
of counsel for either proposed class of plaintiffs.  Rowe
Plaintiffs' counsel are experienced litigators, specifically in

the areas of personal injury and environmental contamination. (Rowe Motion at 42 (citing Blecher Aff. at Ex. 16, p. 3)). Likewise, Scott counsel has sufficient experience in class actions to merit his representation of the proposed Scott class. (Scott Motion at 34).

However, the parties do dispute the second part of the adequacy requirement, which concerns the named plaintiffs themselves.  This part of the inquiry addresses whether the named plaintiffs have "the ability and the incentive to represent the claims of the class vigorously" and whether there is any "conflict between the individual[s'] claims and those asserted on behalf of the class."  Hassine v. Jeffes, 846 F.2d 169, 179 (3d Cir. 1988).  DuPont claims that the named plaintiffs in both the Rowe and Scott cases have conflicts of interest with the other class members which prevent them from being adequate representatives of their respective classes.  In support of this argument, DuPont relies on the same alleged conflicts set forth under the typicality analysis - namely, differences in water consumption habits, variations in medical monitoring needs (due to present manifestation and/or family histories), discrepancies in types of damages sought, and distinctions between the Rowe and Scott theories.

The Court finds that none of these alleged conflicts of interest demonstrates that the named plaintiffs are inadequate

20

representatives of their respective classes.  First, the fact
that the named plaintiffs drink primarily bottled water as
opposed to the unfiltered PGWS water is a distinction without a
difference, as this would not pit the named plaintiffs and the
other class members against one another.  "[D]ifferences in the
interests of the class representatives and the other class
members is not dispositive under Rule 23(a)(4).  The key question
is whether their interests are antagonistic." Steiner v.
Equimark Corp., 96 F.R.D. 603, 610 (W.D. Pa. 1983) (citing Wetzel
v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975)).  The
same reasoning undermines DuPont's argument concerning medical
monitoring needs – even though there may be variations in the
individuals' specific needs, their interests are still aligned in
that they all desire some type of monitoring to afford them the
opportunity for early detection of potential diseases.

    As to the damages argument, both the Rowe class and the
Scott class have explicitly represented that they do not seek any
money damages for personal injuries, but only injunctive relief
(and only in the form of medical monitoring, for purposes of this
Court's discussion).  (See, e.g., Rowe Reply at 10; Scott Motion
at 39).  Where the plaintiffs "seek only medical monitoring
relief on behalf of themselves and the class, and do not advance
claims for present injuries, there is no conflict of interest..."
In re Welding Fume Prods. Liability Litigation, 245 F.R.D. 279,

301 (N.D. Ohio 2007).  Finally, any differences between the Rowe
Plaintiffs and Ms. Scott are irrelevant for purposes of
determining whether the named plaintiffs are adequate
representatives of their own respective classes.

Because DuPont has not met its burden of demonstrating that
the named plaintiffs are inadequate representatives of their
respective classes, the Court finds the adequacy of
representation element satisfied.

### C.  Rule 23(b) Requirements

Having found that Plaintiffs have met the requirements of
23(a), the Court must now proceed to the requirements of 23(b).
Pursuant to this section, Plaintiffs must demonstrate that
certification is appropriate under part (b)(1), (b)(2), or
(b)(3).  Both the Rowe Plaintiffs and the Scott Plaintiff assert
that certification is proper under either (b)(1) or (b)(2);
additionally, the Scott Plaintiff argues that certification is
proper under (b)(3).  Thus, the Court will address all three
parts.

### 1.  Certification under 23(b)(1)

Under part (b)(1) of Rule 23, a class action may be
certified if

> prosecuting separate actions by or against individual
> class members would create a risk of
>
> (A) inconsistent or varying adjudications with respect

22

to individual class members that would establish
incompatible standards of conduct for the party
opposing the class; or

(B) adjudications with respect to individual class
members that, as a practical matter, would be
dispositive of the interests of the other members not
parties to the individual adjudications or would
substantially impair or impede their ability to protect
their interests[.]

Fed. R. Civ. P. 23(b)(1).

Plaintiffs claim that the circumstances here satisfy the
requirements of (b)(1)(A) because separate actions could create a
risk of inconsistent judgments and establish incompatible
standards of conduct for DuPont.  (Rowe Motion at 44; Scott
Motion at 36).  In support of their argument, Plaintiffs assert
that "DuPont has previously agreed that the existence of more
than one proceeding to consider common factual and legal issues
'creates a real danger of inconsistent rulings' in this very
situation."  (Rowe Motion at 44 (quoting Leach v. E.I. du Pont de
Nemours & Co., 2002 WL 1270121 at *13 (W. Va. Cir. Ct., April 10,
2002)); see also Scott Motion at 36-37).  Plaintiffs also cite a
number of other decisions outside this jurisdiction in which
courts have certified medical monitoring classes under (b)(1)(A).
(Rowe Motion at 44; Scott Motion at 37-38).

As an initial matter, the Court notes that Plaintiffs,
throughout their briefs, have relied heavily on the West Virginia
state court's decision in Leach.  While it is clear that
Plaintiffs believe the Leach decision to be analogous to the

23

current case, this Court finds Plaintiffs' reliance misplaced.
First, the West Virginia medical monitoring law and facts
concerning the contamination in Leach are different than those in
the case at bar; this makes the arguments in Leach of little
relevance to the present case.  Moreover, the Leach case was
ultimately resolved through voluntary settlement.  Accordingly,
DuPont's statements cannot be considered admissions of liability,
causation, or appropriate damages.  Furthermore, the other
decisions Plaintiffs cite are from other jurisdictions and, thus,
are not binding on this Court.  As DuPont has noted, "there is no
[published] precedent under New Jersey law or in the Third
Circuit for certification of a class seeking medical monitoring
relief under Ayers."  (DuPont Motion at 23).[6]

Beyond the lack of relevant authority supporting Plaintiffs'
position, DuPont also correctly points out that under (b)(1)(A),
inconsistent adjudications are significant only insofar as they
impose "incompatible standards of conduct" on the defendant.
(DuPont Opp. at 56-57).  As the Third Circuit explained,
"[s]ubsection (b)(1)(A) addresses possible prejudice to the party
opposing the class and is intended to eliminate the possibility
of separate actions imposing inconsistent courses of conduct on
the defendant."  Beck v. Maximus, Inc., 457 F.3d 291, 301 (3d

_____

[6]  The New Jersey cases cited by the Scott Plaintiff are
unpublished decisions from lower courts that are not binding on
this Court.  (Scott Motion at 23).

Cir. 2006); <u>see also</u> 7AA C. Wright, A. Miller & R. Kane, Federal Practice and Procedure [hereinafter Wright & Miller] § 1773, at 22 (2005) ("subsection (b)(1)(A) is applicable when practical necessity forces the opposing party to act in the same manner toward the individual class members and thereby makes inconsistent adjudications in separate actions unworkable or intolerable").  The "incompatible standards of conduct" language of (b)(1)(A) "requires more than a risk that separate judgments would oblige the opposing party to pay damages to some class members but not to others or to pay them different amounts..." 7AA Wright & Miller § 1773, at 13.

In this case, the fact that some individual plaintiffs may succeed in their claims against DuPont for medical monitoring while others may not does not translate into "incompatible standards of conduct" for DuPont under 23(b)(1)(A).  <u>See, e.g.</u> <u>Abbent v. Eastman Kodak Co.</u>, 1992 WL 1472751 at *12 (D.N.J. 1992) ("'individual adjudication of medical monitoring claims would not expose defendants to a risk of conflicting obligations") (quoting <u>Brown v. SEPTA</u>, 1987 WL 9273 at *13 (E.D. Pa. 1987)).  Were such inconsistent adjudications to occur, DuPont would simply pay for the monitoring of the successful plaintiffs and not for those plaintiffs who failed in their claims - this does not amount to conflicting obligations.  <u>See</u> <u>id.</u> ("'[a]t most, defendants may be ordered to pay for medical testing in some cases and not in

25

others - a scenario not intended for class treatment'"). As there is no danger of DuPont being exposed to conflicting obligations in terms of Plaintiffs' medical monitoring claims, certification under Rule 23(b)(1)(A) is not appropriate here.

### 2. Certification under 23(b)(2)

Part (b)(2) of Rule 23 provides that a class action may be maintained if

> the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]

Fed. R. Civ. P. 23(b)(2). Thus, to merit certification under section (b)(2), Plaintiffs must show that DuPont's conduct or refusal to act is "generally applicable" to the class and that the relief they seek is primarily injunctive. 7AA Wright & Miller § 1775, at 41. Additionally, for certification under (b)(2), "it is well established that the class claims must be cohesive." Barnes, 161 F.3d at 143. In fact, "a (b)(2) class may require more cohesiveness than a (b)(3) class ... because in a (b)(2) action, unnamed members are bound by the action without the opportunity to opt out." Id. at 142.

Moreover, "the district court has the discretion to deny certification in Rule 23(b)(2) cases in the presence of disparate factual circumstances." Id. at 143. (internal quotation omitted). The determination of whether a class involves

26

individualized issues is important for two reasons: (1) "unnamed members with valid individual claims are bound by the action without the opportunity to withdraw and may be prejudiced by a negative judgment in the class action[;]" and (2) "the suit could become unmanageable and little value would be gained in proceeding as a class action ... if significant individual issues were to arise consistently." Id. (finding that the case presented "too many individual issues to permit certification").

It is clear that the first two of these requirements is satisfied here. First, DuPont's conduct is "generally applicable" to both classes, as DuPont has allegedly released PFOA into the water sources used by (or at least intended for the use by) members of both classes. Second, both classes' requests for medical monitoring in this case can be considered requests for injunctive relief. See, e.g., Barnes (noting district court's conclusion that "under certain circumstances medical monitoring could constitute the injunctive relief required by Rule 23(b)(2)") (citing Arch v. American Tobacco Co., Inc., 175 F.R.D. 469, 483 (E.D. Pa. 1997)).

The more difficult issue is whether Plaintiffs can demonstrate the requisite cohesiveness among the class members. To determine whether the presence of individualized issues precludes a finding of cohesiveness, this Court must examine the elements of Plaintiffs' claim. As one New Jersey court has

27

succinctly explained,

> [i]n order to determine if the class meets the
> requirement of cohesiveness under (b)(2), the court
> must analyze the legal and factual issues involved in
> the specific case, and determine if the claims of class
> members can more sensibly be adjudicated as a group or
> if the case would essentially break down into
> litigation of individual claims due to the presence of
> significant individual issues.

Goasdone v. American Cyanamid Corp., 808 A.2d 159, 169 (N.J.

Super. Ct. June 7, 2002).  Thus, Plaintiffs must demonstrate that

their respective classes are cohesive by showing that all class

members can prove the elements of medical monitoring through

common evidence:

> (1) class members suffered significant exposure to PFOA;
>
> (2) PFOA is toxic;
>
> (3) the diseases caused by exposure to PFOA are serious;
>
> (4) class members are at a distinctive increased risk of
> disease due to their exposure to PFOA;
>
> (5) early diagnosis of these diseases is valuable; and
>
> (6) medical monitoring is reasonable, necessary and
> different than any other monitoring the class members would
> otherwise have to undergo.

The Court finds that three of these elements could be proven

by common evidence – namely, the toxicity of PFOA, the

seriousness of the diseases caused by PFOA exposure, and the

value of early diagnosis of these diseases.  The evidence needed

to prove each of these elements would be the same for every

28

plaintiff (presumably, objective scientific evidence by experts); there would be no individualized issues.  However, the Court finds that the other three elements - significant exposure, increased risk of disease, and need for medical monitoring different than any monitoring than otherwise required - are problematic in this regard.

### a.  Significant Exposure to PFOA

To obtain medical monitoring, Plaintiffs must demonstrate that all class members suffered "significant exposure" to PFOA. However, neither the Rowe Plaintiffs nor the Scott Plaintiff have offered any evidence of what constitutes "significant exposure." Nor have they provided any proof that <u>any</u> class member (let alone <u>all</u> class members) has reached that level of significant exposure.

Instead, the Rowe Plaintiffs rely on the use of a standard "risk assessment" method to demonstrate class-wide significant exposure.  By using the risk assessment process, the Rowe Plaintiffs claim they are able to show significant exposure across the entire class "without the need to consider any individual exposure, use, medical, or other 'individualized' issues."  (Rowe Reply at 20).  The Court will discuss the use of risk assessments in detail below.

As to the Scott Plaintiff, the Court must initially note that she offers no analysis or evidence as to any of the specific

elements of medical monitoring.  Rather, she relies on the broad

principle that "no class can be perfectly homogenous."  (Scott

Motion at 18 (internal citation omitted)).  According to the

Scott Plaintiff,

> if the personal health characteristics of class members
> could defeat class certification of an <u>Ayers</u> claim,
> then no class for medical monitoring could ever be
> certified under <u>Ayers</u> because there are always such
> differences in any group greater than one.  Yet, the
> courts of New Jersey have had no problem certifying
> medical monitoring classes under <u>Ayers</u>.

(<u>Id.</u> (citation omitted)).  As the Court has already explained,

the New Jersey authorities upon which the Scott Plaintiff relies

are unpublished decisions from lower courts and, thus, they are

not binding on this Court.[7]  Additionally, as discussed below,

personal health characteristics are just one of many

individualized issues that pose a problem for the cohesiveness of

the Scott class.

Despite the Scott Plaintiff's failure to address the

specific elements of medical monitoring, it appears that her

theory of significant exposure rests on the same type of risk

assessment theory relied on by the Rowe Plaintiffs.  However, in

sharp contrast to the Rowe Plaintiffs, the Scott Plaintiff offers

no explanation of risk assessment methodology, nor any analysis

---

[7] <u>Wilson v. Lipari Landfill</u>, No. GLO- L-1375-95 (N.J. Super.
Law Div. Jan. 20, 2000); <u>Vadino v. American Home Products</u>, No.
MID-L-425-98, (N.J. Super. Ct. Law Div. Jan. 25, 1999); <u>Mignan v.
Sullivan et al</u>, No. GLO-L-1309-06, (N. J. Super. Ct., Gloucester
County, Law Div. June 1, 2007).

or expert opinion as to why it is useful in this case.  She
alleges that the PFOA level found in the PGWS water supply is up
to "five times higher than the 0.04 ppm PFOA level that the New
Jersey Departmental [sic] of Environmental Protection says is
safe for human drinking water."  (Scott Motion at 5).  By
referring to the NJDEP preliminary safety guideline of .04 ppb,
it seems that the Scott Plaintiff is necessarily relying on a
risk assessment theory because the NJDEP level itself was
developed based on the risk assessment method, albeit a different
risk assessment than the one developed by Dr. Gray.[8]  (See NJDEP
Memo); Hearing Tr. at 166:16-20).

---

[8] The NJDEP's risk assessment approach for developing the
PFOA preliminary safety guideline of .04 ppb was "based on a
target human blood PFOA level rather than on a target external
(ingested) dose of PFOA, the approach used for assessing most
other chemicals."  (NJDEP Memo at 2).  This is because "a given
external dose (in mg/kg/day) of PFOA results in very different
internal doses (as indicated by blood levels) in humans and
animals."  (Id.).  The NJDEP noted that the USEPA 2005 draft PFOA
risk assessment uses the same approach "based on blood levels in
the animals rather than on the external dose they received, and
this approach was endorsed by the Science Advisory Board (2006)
report reviewing the USEPA draft PFOA risk assessment."  (Id.).
    While the NJDEP risk assessment does not rely on the same
assumptions as Dr. Gray's risk assessment, it does rely on other
types of assumptions, such as a default value of 20% for a
relative source contribution "(meaning that non-drinking water
sources are assumed to provide 80% of total exposure)" (Id. at
3).  It also "assumes that the daily drinking water intake in the
population of concern is similar to the intake in the population
study by Emmett et al., 2006."  (Id. at 9).  Indeed, the NJDEP
memo states that its approach "involves more assumptions than the
traditional risk assessment approach based upon administered
dose."  (Id. at 8).  The NJDEP risk assessment suffers from the
same basic deficiencies as Dr. Gray's risk assessment.  (See
infra).

Moreover, the Scott Plaintiff acknowledges the role of a risk assessment in this case, noting that "as a practical matter, a PFOA risk assessment could be done for the entire Scott class as part of a court-supervised medical monitoring program." (Scott Motion at 18).  Thus, while she recognizes that a risk assessment specific to the Scott class might be helpful, she admits that she has done nothing herself on this front.  Having offered no evidence of the potential class members' exposure (nor even a reasonable argument on this subject), the Scott Plaintiff has failed to demonstrate class-wide significant exposure.

Turning back to the Rowe risk assessment, the Rowe Plaintiffs explain in their papers that the risk assessment method determines "what level of chemical in the community's water presents an unreasonable risk of harm to all members of the community."  (Rowe Reply at 19-20).  In this case, Rowe's expert, Dr. Gray, calculated a "safe level" of .02 ppb[9], meaning that "if exposure is held below that concentration, the likelihood of ... adverse disease outcomes is unlikely, and if the exposure is greater than that, the risk of adverse outcomes is increased." (Hearing Tr. at 81:10-13).  The risk assessment is calculated by using "certain routine accepted variables (referred to as 'default values' and uncertainty factors')" to account for

---

[9] This is in contrast with the .04 ppb preliminary safety guideline established by the NJDEP.

variations in individuals' characteristics, such as age, sex, weight, medical history, water consumption patterns, etc.. (Rowe Reply at 19).  In other words, the risk assessment is based on the reported averages of these characteristics within the general population.  Here, Dr. Gray testified that he "used the standard risk assessment assumptions for [individuals' size and water consumption habits] that's used by the EPA risk assessment framework[,]" specifically, the EPA Methodology for Deriving Ambient Water Quality Criteria for the Protection of Human Health (2000) (DuPont Opp., Ex. B32).  (Hearing Tr. at 82:9-11; see also 83:24-84:1).  Thus, in calculating the .02 ppb level, Dr. Gray assumed that each individual class member weighs 70 kilograms and consumes two liters of tap water per day.  (Id. at 83:18-20).

While the Rowe Plaintiffs tout the risk assessment method as the ideal means of proving common exposure among the class members, the Court finds that this method establishes nothing more than an assumption of common exposure.  The risk assessment method requires the Court to assume that all class members weigh 70kg and consume 2 liters of tap water per day.  Once this assumption is made, the Court can conclude that all class members suffer significant exposure when the PFOA concentration level is .02 ppb.  Of course, the problem is that the underlying assumptions are not necessarily true for all class members - indeed, they are undoubtedly false, as the class contains

33

thousands of individuals who are different sizes and have different water consumption habits.[10]

The testimony elicited by the Court from Dr. Gray at the hearing demonstrates that an individual's exposure does in fact change based on the exact variables for which the Plaintiffs seek to make assumptions:

> THE COURT:  Well, let's just say that the 300-pound person only took showers and drank bottled water and ate out.  In Pennsylvania.
>
> THE WITNESS:  Then their exposure would be much lower.

(Id. at 103:7-10).

Rather than relying on assumptions about exposure, the Rowe Plaintiffs should have conducted more extensive research concerning the proposed class members' characteristics related to their exposure (and in the case of the Scott class, any research would have been better than nothing).  For example, as the Court suggested during the hearing, Plaintiffs could have asked proposed class members to complete "a questionnaire or something looking at various individuals' habits and weights, and etcetera..."  (Id. at 103:23-24).  Additionally, Plaintiffs could have conducted blood serum tests of the proposed class members to

---

[10] In fact, upon cross-examination, Dr. Gray admitted that he did not know whether even the named plaintiffs' water consumption patterns were consistent with the variables assumed by his risk assessment model.  (Id. at 130:13-131:3).  As counsel for DuPont revealed, the water consumption for seven of the eight Rowe Plaintiffs do not comport with Dr. Gray's assumptions.  (Id. at 134:15-135:5; DuPont Hearing Ex. 27).

determine whether they indeed have elevated levels of PFOA above the general population, which is useful in determining historical exposure.[11]   (Id. at 108:4-16).   Dr. Gray testified that both a questionnaire and blood testing would be useful, even though they would not present the complete story.   (Id. at 108:21).   Dr. Levy (the Rowe Plaintiffs' second expert) gave similar testimony. (Id. at 207:23-25).   But Plaintiffs have neither questioned nor tested the proposed class members.   Instead, they rely on the assumptions underlying the risk assessment method.[12]

At the hearing, Dr. Gray explained the reason for relying on these types of assumptions as follows:

> what you necessarily have to do is make an assumption regarding water consumption.   You can't - it would be a very detailed, intensive and huge undertaking to try to go out and assess what everybody's water use was, what

---

[11] This type of testing could also have been useful in overcoming another issue concerning variations in exposure – apparently, the levels of PFOA in the PGWS water have varied over time and within the distribution system.   (See DuPont Opp. at 41).   Given the complexity of this variation, it would be impossible to determine an individual's exact amount of PFOA exposure based solely on his/her water consumption habits. However, blood serum testing could help alleviate this problem.

[12] Significantly, at the hearing, counsel for the Rowe Plaintiffs stated that the information that could be obtained from questionnaires and blood testing is "exactly the type of information that we were requesting through our biomonitoring relief."   (Hearing Tr. at 106:16-18).   He further admitted to the Court that "it would be very helpful to know, indeed, what the blood level is for each person in the proposed class and to survey them."   (Id. at 106:18-20).   However, counsel appears to have it backwards – under basic principles of tort law, the claim must be successful before the remedy can be rewarded, not the other way around.

their real exposure to water use was, because it's not
just asking them how many glasses of water they drink
from the tap, it's asking them about what foods they
eat and how they prepare them and what beverages they
drink.  And for a large population, I mean, it could be
done, but, you know, we don't do that in public health,
we make assumptions about that.

(Id. at 97:5-14).  Although the Court recognizes that it would
take significant investigative efforts to obtain information
specific to each individual in the proposed class, the difficulty
of this task does not excuse Plaintiffs from doing it.  A class
action is not intended to be an easy way around research
problems.  While the public health sector may rely on
assumptions, our tort litigation system does not operate in the
same way.  Plaintiffs have the burden of proving that each class
member has suffered significant exposure to PFOA – they cannot
circumvent this requirement by simply relying on assumptions
about the general population.

The risk assessment method provides no evidence of actual
common exposure; instead, it attempts to characterize exposure as
common by glossing over the many individualized issues underlying
this element.  The reality is that the element of significant
exposure is fraught with individualized issues.  These issues
weigh heavily against a finding of cohesion.

In addition to the problems created by the use of "default
values" for class members' size and water consumption habits, the
Court finds the Rowe Plaintiffs' reliance on the risk assessment

36

method problematic because the .02 ppb level is based on long-term exposure.  At the hearing, Dr. Gray testified that "this type of analysis is meant to be protective for long term exposure."  (Id. at 88:24-25; see also Gray Report at 10 ("0.02 ppb is meant to be protective of human health for long-term chronic exposures").  He stated that in calculating the risk assessment, "[t]he exposure duration is consider[ed] to be long term, essentially lifetime..." (Hearing Tr. at 82:13-17).  While Dr. Gray explained that it is difficult to define long term exposure, he also stated that he "wouldn't consider long term exposure one year." (Id. at 88:21-22; see also 99:13-16 ("[by long period of time] I mean years.  I mean greater than a year").

Yet, despite Dr. Gray's testimony, the Rowe class is defined as "all individuals who have consumed for at least one year water from a Contaminated Source" and the Scott class has no temporal limitation whatsoever.  (Rowe Sec. Am. Compl. ¶ 22 (emphasis added); see Scott Sec. Am. Compl. ¶ 1).  In the view of this Court, Plaintiffs' positions are internally inconsistent - both classes rely on risk assessments which are based on long term exposure but define their classes without any regard for long term exposure.  Plaintiffs cannot have it both ways.  If they want to demonstrate class-wide significant exposure by using a risk assessment method based on long term exposure, then they must also define their classes using this same long term exposure

criteria.

However, even if the class definition were defined to include only those individuals with long term exposure (consistent with the assumption underlying the .02 or .04 risk assessment level), this would not resolve the problem because long term exposure sufficient to reach the "significant exposure" level is different for each individual depending on their characteristics.  Dr. Gray testified that for a 300-pound person who took showers in the contaminated water, but drank bottled water and ate out in Pennsylvania, "[i]f any effects would occur at all, it would take longer [than the one year it might take for a 70kg person who consumed 2 liters per day]..." (Id. at 103:7-14).  Thus, it appears there is no such thing as a class-wide duration of exposure that would constitute "significant exposure" for all class members.[13]  This is yet another individualized issue weighing against cohesion.

In an attempt to find a class-wide durational component, the Rowe Plaintiffs selected one year as the temporal restriction for their class definition.  This is undoubtedly based on Dr. Gray's conclusion that a person may begin to exhibit effects after just one year of exposure to water with a PFOA level of .02 ppb.  (Id. at 86:25-87:1).  During the hearing, Dr. Gray explained that this

---

[13] Again, the Scott Plaintiff offered no analysis in this regard.

38

conclusion was based on his analysis of toxicological data from a rat study, which showed that rats exposed to PFOA (at the rat equivalent of the .02 level) began to show effects such as liver toxicity after only three months of exposure. (Id. at 86:19-23). Dr. Gray stated that he did "a physiologic time scaling between the rat and the human[,]" meaning he multiplied the three-month period that it took for affects to occur in the rats by the number four, which is the factor of difference between a 250 gram rat and a 70 kg human. (Id. at 100:20-21, 101:8-13). The result was 12 months, or one year.[14]

The Court is troubled by the Rowe Plaintiffs' use of the one-year time period for two reasons. First, Dr. Gray's calculations concerning the rat study are premised on the same risk assessment level (.02) which, as discussed above, is based on impermissible assumptions. Second, the rat study illustrates the basic goal underlying risk assessments, which is to determine a level that will protect the most sensitive members of the population. (DuPont Opp. at 34-35). Dr. Gray testified that his one year estimate signifies "when affects [sic] might start to occur in humans." (Id. at 101:12-13). Accordingly, one year represents the lower bound at which the most sensitive member in the class might be affected; it is not a threshold at which all

---

[14] Once again, the Scott Plaintiff presented nothing on this issue.

or even most members might be affected.  As explained in a
publication by the Federal Judicial Center and the National
Center for State Courts,

> [b]ecause a number of protective, often "worst case"
> assumptions ... are made in estimating allowable
> exposures for large populations, these criteria and the
> resulting regulatory levels ... generally overestimate
> potential toxicity levels for nearly all individuals.

David E. Eaton, Ph.D., DABT, FATS, "Scientific Judgment and Toxic
Torts - A Primer in Toxicology for Judges and Lawyers," 12 J. L.
& Pol'y 1, 34 (2003) (DuPont Opp. Ex. B31).  Given the protective
goal and conservative nature of risk assessments, this Court
finds that reliance on them for purposes of defining the classes
in this case is inappropriate, as it would result in
overinclusive classes.  (See DuPont Opp. at 34).

    In sum, the Court finds that both Plaintiffs have failed to
show how significant exposure is subject to common proof.  Rather
than conducting in-depth research and meaningfully identifying a
group of individuals who have actually suffered "significant
exposure," Plaintiffs have relied on risk assessments and
superficially identified a group of individuals who have
potentially suffered "significant exposure."  This is
insufficient for purposes of class certification.  The lack of a
common durational component only adds to the deficiency.
Plaintiffs must show that they can prove class-wide significant
exposure through relevant facts and research, not perfunctory

similarities and assumptions.  Although such research may cost significant time and resources and may even outweigh the costs of medical monitoring (see, e.g., Hearing Tr. at 104:2-4), this fact does not alleviate Plaintiffs of their burden to show that significant exposure can be proven on a class-wide basis.  Given the record before this Court, Plaintiffs have not met their burden.  Thus, there is no cohesion among class members in terms of demonstrating significant exposure to PFOA.[15]

### b.  Increased Risk of Disease

Beyond the element of significant exposure, Plaintiffs must also demonstrate that each class member's "exposure caused a distinctive increased risk of future injury."  Theer, 133 N.J. at 628 (emphasis added).  While "[t]he risk of injury need not be quantified[,] ... the plaintiff must establish that the risk of serious disease is 'significant.'"  Player, 2006 WL 166542 at *9 (citing Ayers, 106 N.J. at 599-600 ("medical science may necessarily and properly intervene where there is a significant but unquantified risk of serious disease")).

---

[15] To be clear, although the Court's rejection of the risk assessment method in this case has been discussed largely in the context of the testimony offered by the Rowe Plaintiffs' expert, the same reasoning applies to the Scott Plaintiff's theory, which also relies on the risk assessment method.  Moreover, the Court must point out that it could not discuss the Scott Plaintiff's theory in any detail because, unlike the Rowe Plaintiffs who have earnestly attempted to support their claim for certification, the Scott Plaintiff has offered nothing to explain its theory of significant exposure and how this element is subject to common proof.

The Rowe Plaintiffs claim that "the whole class is at increased risk based on the level of C-8 in their common water source and the minimum period of exposure required by the class definition." (Rowe Reply at 18). In support of this argument, the Rowe Plaintiffs rely on the same risk assessment theory and physiologic time scaling done by Dr. Gray, both of which the Court has already rejected. They also rely on the testimony and statistical analysis of Dr. Levy.

As for the Scott class, the Plaintiff has failed even to address this element, let alone present any scientific evidence. Therefore, the Court is prevented, once again, from performing a "rigorous analysis."

DuPont argues that Plaintiffs cannot prove this element on a class-wide basis because each individual's risk of disease will vary depending on his/her actual PFOA exposure as well as his/her background risk of disease absent PFOA exposure. (DuPont Opp. at 47). This Court agrees.

Many of the individualized issues precluding a class-wide finding of significant exposure also preclude a class-wide finding of increased risk of disease. As the Court explained above, there is no proof of common significant exposure among the class; rather, class members' actual exposure will vary depending on their size and water consumption habits, not to mention their duration of use of the PGWS water supply. The amount of exposure

42

a person has experienced will affect his/her level of risk of disease.  (See, e.g., Gray Report at 13 ("[i]n general, toxicity is considered to be related to dose level and dose duration")). Dr. Gray testified that "[e]xposure is certainly very important and somebody who is not exposed to PFOA in water doesn't have that component of PFOA in their PFOA body burden and so their risk is less."  (Hearing Tr. at 126:22-25; see also 145:16-17 ("any increase in the body burden of a toxic compound is going to increase the risk of toxic effects")).  Dr. Levy's testimony supports this notion as well.  (Id. at 208:21-209:3).[16]

Additionally, each class member's risk of disease will differ depending on his/her background risk of disease and susceptibility to PFOA.  Both of these factors depend largely on individual circumstances, such as gender, age, drug/alcohol use, nutrition, body mass index, physiology, behavior, medical history (including conditions such as hyperlipodemia and liver diseases),

---

[16] Dr. Levy's testimony concerning his statistical analysis of the Rowe Plaintiffs' serum PFOA levels as compared with those of the general population showed that the amount of contaminated water consumed will affect serum PFOA levels.  (Rowe Hearing Ex. 12).  He testified that, unlike the female Rowe Plaintiffs, plaintiff Mr. Rowe has a blood serum level that is "lower than the national average and far lower than the 90th percentile" and that, at least in part, this is because he has "been using bottled water for the last eight years." (Id. at 208:21-25). While the Court recognizes that blood serum levels do not present the complete picture of a person's risk of disease, when supplemented with a questionnaire, serum levels can still be helpful in understanding a person's exposure and risk.  (Id. at 209:1-3).

and general state of health.  (Id. at 136:7-137:6; 140:17).

Indeed, as Dr. Gray explained, "the risk [of disease] is not
proportional to the difference in [consumption amounts] because
certain individuals have a varying susceptibility to PFOA based
on their medical conditions and other behavioral factors."  (Id.
at 129:16-20).  Recognizing the highly individualized nature of
people's medical circumstances, Dr. Gray testified that "a study
on every person, basically probably getting a serum PFOA level,
as well as a questionnaire that describes their medical
conditions and a whole bunch of things, would be the best way to
determine [who is at risk for an adverse health consequence.]"
(Id. at 130:3-6).

The following colloquy between the Court and Dr. Gray
further illustrates the various individualized issues underlying
an individual's risk of disease and the need for other research
techniques such as questionnaires:

>THE COURT:  ...Do you agree that looking at
>individuals' habits, weight, age, all of those
>individual factors and getting an idea through a
>questionnaire ... you could then determine which
>individuals are really at an increased risk, health
>risk, that that would be – put costs aside – that that
>would be a better way of determining who really needs
>medical attention and monitoring?  Do you agree with
>that?
>
>THE WITNESS:  It would, it would.  But in doing so,
>you'd also have to consider the fact that people have
>conditions, medical conditions –
>
>THE COURT:  Yes.

44

> THE WITNESS:  – that make them more susceptible to the
> action of a chemical like this.  So you would need to
> collect information, medical information about things
> like that as well if you were going to truly assess
> what their vulnerability to the –
>
> THE COURT:  That would all have to be taken into
> consideration and you may not be able to do it with
> precision, but it's the best model that you have,
> putting aside costs?
>
> THE WITNESS:  Costs and time.  It would probably be a
> superior – yes I think that's true.

(Id. at 104:6-105:2).

In addition to the problem of pervasive individualized issues, the risk assessment, as discussed above, does not serve the function Plaintiffs would like it to - it does not identify the "danger" point above which individuals are at a distinctive increased risk.  Rather, the risk assessment serves to identify the "safe" level that will protect the most sensitive members of the population.  As Dr. Gray explained, when calculating a risk assessment, "you want to make the assumption that protects most people."  (Id. at 128:13-14; see also 139:7-10).  The NJDEP risk assessment relied on by the Scott Plaintiff is likewise designed to be protective of the population.  (See, e.g., NJDEP Memo at 9 ("[t]his drinking water concentration [of .04 ppb] is expected to be protective for both non-cancer effects and cancer at the one in a million risk level")).  While reliance on risk assessments may very well be appropriate for regulatory purposes where the goal is protection of the public, such methodology does not work

45

in the tort litigation context, where a plaintiff must prove that he has suffered an actual increased risk of disease in order to merit recovery in the form of medical monitoring.

Moreover, Plaintiffs have not demonstrated to this Court at what point the risk of increased disease becomes "significant" or "distinctive," as required by the language in Ayers and Theer. In fact, Dr. Gray explained that he's never characterized the risk as significant because "the term 'significant' is not something that [he] normally use[s] in doing a risk assessment, it's not part of the risk assessment paradigm to say that the risk is significant at a certain point."  (Id. at 145:21-24). Dr. Levy likewise refused to "draw[] a bright line" but attempted to define the term qualitatively, as "substantially above the national norms."  (Id. at 205:19-20).  The Court does not find Dr. Levy's definition helpful in the context of determining when an individual should be monitored for disease.

Finally, the Rowe Plaintiffs rely on Dr. Levy's expert report and testimony to show that they are at an increased risk of disease based on their exposure to PFOA in the PGWS water.  In his report, Dr. Levy discussed numerous studies that show a higher incidence of various diseases among people who have been exposed to PFOA.  (See generally Levy Report).  Specifically, Dr. Levy stated that, in his opinion, based on his analyses of various epidemiological studies,

46

> PFOA causes or increases the risk of the following
> categories of diseases and disorders in human beings:
>
> 1.  Liver damage and dysfunction
> 2.  Abnormalities in lipids and lipoproteins
> 3.  Coronary artery disease and cerebrovascular disease
> 4.  Certain endocrine and metabolic disorders
> 5.  Certain categories of cancer
> 6.  Reproductive and developmental disorders.

(Id. at 23).  He further opined that all the potential Rowe class members are at an increased risk of these diseases based on their consumption of drinking water with a PFOA level higher than .02 ppb for at least 1 year.  (Id.).  However, his opinion rests on the same risk assessment that the Court has already deemed insufficient for purposes of showing significant exposure. Accordingly, while Dr. Levy's report may show a connection between PFOA exposure and risk of disease, it does not support the contention that all the class members have been significantly exposed to PFOA and are, therefore, at an increased risk of disease.

Similarly, at the hearing, Dr. Levy presented a number of graphs and statistical analyses which showed a correlation between serum PFOA levels and various liver enzymes associated with liver disease.  (See Rowe Hearing Ex. 12).  He also presented two charts which showed that six of the Rowe Plaintiffs had serum PFOA levels that were much higher than those of the

47

general population.[17]  (Id.).  However, this evidence suggests
only that six of the Rowe Plaintiffs may be at an increased risk
of disease; it does not prove that all potential class members
are at an increased risk of disease because it says nothing about
the actual serum PFOA levels of the proposed class members.  To
reach the conclusion the Rowe Plaintiffs desire, the Court must
make the assumption that all the proposed class members suffered
the same amount of exposure (or more) to PFOA as these six Rowe
Plaintiffs.  As stated in great detail above, the Court cannot
make this assumption.  If the Rowe Plaintiffs wanted to rely on
Dr. Levy's serum PFOA analysis to prove class-wide increased risk
of disease, then they needed to submit evidence of class-wide
heightened serum PFOA levels, which they have not done.[18]

Even if they had submitted such evidence, however, this
would not resolve the entire problem because Dr. Levy's analysis
does not establish any threshold serum PFOA level that signifies
a person is at a distinctive increased risk of disease.
Therefore, in the Court's view, Dr. Levy's testimony is more
relevant to the issue of whether PFOA is hazardous in that it
causes disease in general, not whether the proposed class members

---

[17] For example, Plaintiff Lemke's PFOA serum level was
charted as being six times the geometric mean.  (Rowe Hearing Ex.
12).

[18] This is equally true for the Scott class, as their risk
assessment is based on blood serum levels.  (See NJDEP Memo at
2).

are at a distinctive increased risk of disease based on their
exposure to PFOA.

Given the plethora of individualized issues underlying the
risk of disease issue, as well as the problems associated with
reliance on risk assessments and the difficulty in determining
when the risk becomes significant, Plaintiffs have not and cannot
demonstrate through common proof that all class members are at a
distinctive increased risk of disease.

### c. Medical Monitoring is Reasonable, Necessary and Different than Otherwise Required

Finally, Plaintiffs must demonstrate that each class
member's need for medical monitoring can be shown on a class-wide
basis.  Under New Jersey law, a plaintiff must "reasonably show[]
that medical surveillance is required because the exposure caused
a distinctive increased risk of future injury, and would require
a course of medical monitoring independent of any other that the
plaintiff would otherwise have to undergo."  <u>Theer</u>, 133 N.J. at
628.

The problem underlying Plaintiffs' task here is that the
necessity for medical monitoring is not a common issue for all
class members and, thus, is not subject to common proof.
Plaintiffs must show that each class member needs medical
monitoring above and beyond what he/she would ordinarily need
absent the exposure to PFOA.  <u>See</u> <u>Goasdone</u>, 808 A.2d at 170

(citing <u>Barnes</u>, 161 F.3d at 146).  This requirement implicates the background exposure to other PFOA sources, health history and medical needs of each individual class member.  Undoubtedly, this element raises numerous individual issues.

In sum, although there are some elements of medical monitoring relief that may be subject to common proof, the Court finds that the elements of significant exposure, increased risk of disease, and necessity of medical monitoring pose numerous individualized issues.  Neither class of plaintiffs has demonstrated to this Court how these elements can be proved on a class-wide basis.  The presence of so many individualized issues precludes a finding of cohesiveness, which renders certification under 23(b)(2) inappropriate.

### 3.  Certification under 23(b)(3)

The Scott Plaintiff also requests certification under Rule 23(b)(3).  That part of the rule provides that a class action may be maintained if

> the court finds that the questions of law or fact
> common to class members predominate over any questions
> affecting only individual members and that a class
> action is superior to other available methods for
> fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).  The inquiry under this subsection is twofold: first, the Court must determine whether common questions predominate over individual questions, and second, the Court must decide whether a class action is the superior means of

adjudicating this case.

Turning to the first part of (b)(3), the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997) (citing 7A Wright & Miller at 518-519). The Court recognizes that "the presence of individual questions does not per se rule out a finding of predominance." In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions, 148 F.3d 283, 315 (3d Cir. 1998). However, certification under 23(b)(3) is inappropriate "if the main issues in a case require the separate adjudication of each class member's individual claim or defense..." 7AA Wright & Miller § 1778, at 134. This is because "when individual rather than common issues predominate, the economy and efficiency of class-action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." Id. at 141.

As the Court explained in its discussion of the requirements under Rule 23(a), there are some common issues in this case - DuPont's release of PFOA, the hazardous nature of PFOA, and the availability of medical monitoring for diseases linked to PFOA exposure. However, the Court has also set forth in great detail the litany of individualized issues that pervade Plaintiffs' requests for medical monitoring. To summarize, the Court finds

that three of the essential elements of medical monitoring relief - namely, significant exposure, increased risk of disease, and necessity of medical monitoring - implicate numerous individualized issues.  Just as the plaintiffs in Amchem, class members here have been exposed to different amounts of PFOA, for different amounts of time, in different ways, and over different periods.  Amchem, 521 U.S. at 624.  They have different water consumption habits, different levels of background exposure to PFOA, and different susceptibilities to PFOA.  Moreover, they have different medical histories and different background risks of disease, which translate into different monitoring needs.  Given all of these differences, the Court cannot find that the common questions predominate.

Moving to the second part of (b)(3), the Court must determine whether the class action would be "superior to other available methods for the fair and efficient adjudication of the controversy."  7AA Wright & Miller § 1779, at 151.  This inquiry requires the Court to "balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  Georgine v. Amchem Prods., Inc., 83 F.3d 610, 632 (3d Cir. 1996), aff'd sub nom Amchem Prods., Inc., 521 U.S. 591 (1997).  The four nonexclusive factors the Court should consider in its analysis are:  (1) the interest of individual class members in controlling

52

the prosecution of the action; (2) the extent of litigation already begun by or against class members; (3) the desirability of concentrating the litigation in the particular forum; and (4) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3)(A)-(D).[19]

Here, the Scott Plaintiff has presented no argument as to any of these factors.  Rather, she argues that "class actions are not only the 'superior' method, but the only practical method to pursue the claims of asymptomatic toxic exposure victims..." (Scott Motion at 47).  According to the Scott Plaintiff, "[t]he cost of retaining the necessary medical and scientific experts needed would exceed the costs of monitoring any one person or testing his or her water."  (Id.).

The Scott Plaintiff fails to recognize that despite the presence of some common issues, full adjudication of the medical monitoring claim/remedy would involve resolving many individualized issues.  In other words, if the Scott class succeeded in demonstrating that DuPont is liable for releasing PFOA into the PGWS water supply, that PFOA is hazardous, and that medical monitoring is available for diseases linked to PFOA

---

[19] The Court notes that in light of its determination that the predominance factor has not been met, it need not address at length the remaining superiority requirement, "as failure to meet any one of [the Rule 23 requirements] precludes class certification."  Danvers Motor Co., Inc., v. Ford Motor Co., 543 F.3d 141, 149 (3d Cir. 2008).

exposure, each class member would still have to demonstrate his/her specific exposure, how that exposure has increased his/her risk of disease, and his/her corresponding need for medical monitoring, all of which would require medical expert testimony specific to each individual.  Thus, contrary to the Scott Plaintiff's contention, class certification would not alleviate the problem of extraordinary expense.

As to the four factors listed in Rule 23(b)(3), the Court finds that factors (1) and (3) are not particularly relevant in this case, as the Court is not aware of any issues concerning individual class members wanting to control the action, and all proposed class members live in the same area and would presumably file suit in this forum (though perhaps in state court).  The second factor, however, militates against certification, as the Rowe class membership would likely include many of the proposed Scott class members.  The Court sees no reason for duplicative class actions and, in light of the disparity between the Rowe Plaintiffs' efforts and the Scott Plaintiff's lack thereof, if any class action were to proceed in this case, the Rowe Plaintiffs would clearly be more deserving.  Additionally, the fourth factor weighs heavily against certification.  As the Court has thoroughly explained, the presence of so many individualized issues would make managing a class action for medical monitoring inordinately difficult.  The problems inherent in managing the

individual issues of thousands of class members would certainly
outweigh any advantages gained by allowing the class action to
proceed.  Accordingly, a class action is not the superior means
of adjudication in this case.

In summary, the Court finds that certification under (b)(3)
is not appropriate in this case.

### D.  Certification of Particular Issues under Rule 23(c)(4)

Although Plaintiffs have not demonstrated that their request
for medical monitoring should be certified, pursuant to Rule
23(c)(4) the Court has the power to certify a class with respect
to particular issues.  Specifically, Rule 23(c)(4) provides in
relevant part, "[w]hen appropriate, an action may be brought or
maintained as a class action with respect to particular
issues..." Fed. R. Civ. P. 23(c)(4).  While the court may act on
its own initiative in this regard, it "has no independent
obligation to utilize Rule 23(c)(4) sua sponte." Id. at 587
(citing U.S. Parole Comm'n v. Geraghty, 445 U.S. 388 (1980)).
Indeed, the Plaintiffs bear the burden of submitting proposals to
the court.  See Geraghty, 445 U.S. at 408.

The rationale of Rule 23(c)(4) is "that the advantages and
economies of adjudication issues that are common to the entire
class on a representative basis may be secured even though other
issues in the case may need to be litigated separately by each

class member."  7AA Wright & Miller § 1790, at 589.  However,
"courts have been cautioned against the class certification of
common issues within a single claim by splitting the elements of
a claim into class and individual components."  Stephenson v.
Bell Atlantic Corp., 177 F.R.D. 279, 290 n. 4 (D.N.J. 1997)
(citing In re Rhone-Poulenc Rorer, Inc., 51 F.3d 1293 (7th Cir.
1995) (reversing order for nationwide class certification of
negligence issues relating to HIV contamination of defendant's
products, leaving causation and damages to individual case
determinations); Castano v. American Tobacco Co., 84 F.3d 734
(5th Cir. 1996) (reversing order for nationwide class
certification of certain core tobacco liability issues, to be
followed by individual trials on comparative negligence and
individualized harm)).  Nonetheless, a class action may be proper
even when it contains both common and uncommon issues "so long as
the uncommon questions are not significant compared with the
magnitude and weight of the common issues."  Id.

In this case, Plaintiffs have not sufficiently delineated
the specific issues within their request for medical monitoring
that are appropriate for class treatment.  The Court has labored
to discern some common issues, as set forth above; however, in
light of the Third Circuit's ruling in Wachtel that any
certification order entered by the Court must include "a clear
and complete summary of those claims, issues or defenses subject

56

to class treatment[,]" the Court will leave to Plaintiffs the
task of identifying "clear[ly] and complete[ly]" the specific
issues that they believe merit class certification consistent
with the Court's opinion.  <u>Wachtel</u>, 453 F.3d at 184; <u>see also</u>
Fed. R. Civ. P. 23(c)(1)(B).


**VI.   CONCLUSION**

Based on the Court's analysis above, both the Rowe
Plaintiffs' and the Scott Plaintiff's motions for class
certification are denied.  Because Plaintiffs have failed to
provide any analysis of their claims based on negligence,
nuisance, trespass, battery, strict liability, and the New Jersey
Environmental Rights Act, the Court will deny certification on
these claims without prejudice.  In the event Plaintiffs desire
to seek certification of these claims, they will be required to
seek leave of the Court to file a motion for class certification
out of time and make a sufficient showing of good cause.

As to their claims/remedy requests for medical monitoring,
certification is not proper under any part of Rule 23(b).
However, Plaintiffs will be permitted to make a brief submission
(no longer than ten pages) identifying the precise issues
relevant to medical monitoring that they believe are appropriate
for class treatment consistent with this opinion.  Plaintiffs'
submissions shall be due thirty days from the date of this

opinion and DuPont shall have thirty days thereafter in which to file a brief response (no longer than ten pages).  No further replies from Plaintiffs will be permitted.


Dated:  December 23, 2008      s/Renée Marie Bumb
                               RENÉE MARIE BUMB
                               UNITED STATES DISTRICT JUDGE