**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

| | |
|---|---|
| RICHARD A. ROWE, et al., individually and on behalf of themselves and all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>E.I. DUPONT DE NEMOURS AND COMPANY,<br><br>　　　　Defendant. | [Dkt. Ent. 514, 516, 517, 518, 524, 526]<br><br>Civil No. 06-1810 (RMB/AMD) |
| MISTY SCOTT, on behalf of herself and all others similarly situated,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>E.I. DUPONT DE NEMOURS AND COMPANY,<br><br>　　　　Defendant. | [Dkt. Ent. 448, 450, 451, 452, 458, 460]<br><br>Civil No. 06-3080 (RMB/AMD)<br><br>**OPINION** |

APPEARANCES:

Attorneys for Plaintiffs

    Shari M. Blecher, Esquire
    Stuart J. Lieberman, Esquire
    Michael George Sinkevich, Jr., Esquire
    Lieberman & Blecher, P.C.
    10 Jefferson Plaza Suite 100
    Princeton, NJ 08540

David B. Bryne, III, Esquire
Rhon E. Jones, Esquire
Beasley, Allen, Crow, Methvin, Portis & Miles, P.C.
P.O. Box 4160
Montgomery, Alabama 36103-4160

David D. Johnson, III, Esquire
Larry A. Winter, Esquire
Winter Johnson & Hill, PLLC
P.O. Box 2187
Charleston, WV 25328

Robert A. Bilott, Esquire
William C. Wagner, Esquire
Taft, Stettinius & Hollister, L.L.P.
425 Walnut Steet
Suite 1800
Cincinnati, Ohio 45202-3957

R. Edison Hill, Esquire
Hill, Peterson, Carper, Bee & Deitzler, P.L.L.C.
NorthGate Business Park
500 Tracy Way
Charleston, WV 25311-1261

Attorneys for Defendant

Roy Alan Cohen, Esquire
Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway
P.O. Box 1997
Morristown, NJ 07962

Anthony F. Cavanaugh, Esquire
Jennifer Quinn-Barabanov, Esquire
Libretta Stennes, Esquire
Steptoe & Johnson, L.L.P.
1330 Connecticut Avenue, NW
Washington, DC 20036

Kevin E. Clark, Esquire
John M. Johnson, Esquire
Lightfoot, Franklin, White, L.L.C.
The Clark Building
400 20th Street North
Birmingham, Alabama 35203

Attorneys for Movants Samuel Switzenbaum & Pennsgrove Associates

2

Merrill G. Davidoff, Esquire
Robin Switzenbaum, Esquire
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6305

**BUMB**, United States District Judge:

I.    **INTRODUCTION**

These parallel cases[1] arise from Defendant E.I. du Pont de
Nemours and Company's ("DuPont") alleged release of certain
perfluorinated materials, known as "C-8" or "PFOA," from its
Chambers Works Plant in Salem County, New Jersey.  The
plaintiffs, who reside near the plant, represent subclasses of
residents they contend have been adversely affected by the
presence of PFOA in their drinking water.  DuPont adamantly
disputes that residents neighboring their plant have suffered
any harm attributable to PFOA.

After almost five years of extensive, dogged litigation, the
parties have entered into a settlement agreement, which they now
ask the Court to approve.

A.    **Plaintiffs' Claims**

The representative plaintiffs in Civil Action No. 06-1810,
Richard Rowe, Michelle Tomarchino, Regina Trout, Allen Moore,
Catherine Lawrence, Kathleen Lemke and Gina Carter[2] (the "Rowe

---

[1] The Court consolidated these cases for discovery purposes.

[2] Pursuant to Rule 25(a), the Court permitted the
substitution of Gina Carter, the representative of former

Plaintiffs"), initiated suit on April 18, 2006, seeking declaratory, equitable and injunctive relief on behalf of individuals who consumed drinking water containing more than 0.05[3] parts per billion ("ppb") of any one, or combination of, PFCs attributable to DuPont's Chambers Works Plant.  The complaint (the "Rowe Complaint") alleged claims for negligence, gross negligence, private nuisance, trespass, battery and medical monitoring.

On July 7, 2006, DuPont removed a similar action to this Court, Civil Action No. 06-3080, filed by representative plaintiff Donald Coles, who was later replaced by plaintiff Misty Scott[4] (the "Scott Complaint").  The Scott Complaint sought relief on behalf of all persons who received drinking water from Pennsville Township Water Department/Pennsgrove Water Supply Company ("PGWS") and, like the Rowe Complaint, alleged claims for medical monitoring, strict liability, private nuisance, public nuisance, trespass and negligence, and later added claims for public nuisance and violation of the New Jersey Environmental

---

plaintiff Mary Carter's estate.

[3]Plaintiffs later lowered the alleged contamination level to 0.04 ppb of any one, or combination of, PFCs attributable to the Chambers Works Plant.

[4]Plaintiff Misty Scott joined this litigation on January 22, 2007.  Scott became the sole representative Plaintiff on October 18, 2007.

Rights Act ("NJERA").[6]

**B.    Plaintiffs' Limited Class Certification**

As the dockets in both cases reveal, the Plaintiffs'
attempts to certify their claims as class claims were not
entirely successful.  Initially, on April 30, 2008, the Rowe and
Scott Plaintiffs sought class certification of all of their
claims.  In a written Opinion, dated December 23, 2008, the Court
denied their request.  Plaintiffs thereafter sought to certify
their medical monitoring claims, which the Court denied in
another written opinion, dated July 29, 2009.  Plaintiffs renewed
their request for certification of the classes, which the Court
granted, but in limited part, on October 9, 2009.  Specifically,
pursuant to Federal Rule of Civil Procedure Rule 23(b)(2), the
Court certified (a) a subclass of private well owners seeking
injunctive relief for private nuisance (the Rowe Complaint) and
(b) a subclass of PGWS customers seeking injunctive relief for
public nuisance (the Scott Complaint).  The Court also certified
the issue of strict liability for class treatment.[7]

**C.    Preliminary Approval of the Parties' Settlement**

_____

[6]The Court subsequently granted DuPont's motion to dismiss
the Scott Plaintiff's NJERA claim.  Since their initial filings,
both the Rowe and Scott Plaintiffs have amended their respective
complaints to add additional, non-class claims.

[7]On December 30, 2009, the United States Court of Appeals
for the Third Circuit denied DuPont's petition seeking leave to
appeal the Court's certification Order.

On September 13, 2010, after years of extensive, exhaustive discovery, involving countless discovery disputes, DuPont moved for summary judgment as to all the Rowe and Scott Plaintiffs' class claims and common law claims.  Rowe and Scott Plaintiffs filed lengthy opposition papers.  The parties also filed numerous motions in limine to exclude their competing experts' opinions.

During the pendency of these motions, the parties informed the Court that they had reached a settlement which they asked this Court to approve.  The Court scheduled a preliminary hearing, and after considering the relevant Girsh and Prudential factors, discussed infra, the Court denied the parties' request for approval.  Essentially, for the reasons more specifically articulated by the Court during the hearing, the Court held that the settlement failed to provide class members with adequate relief.  The parties returned to their settlement discussions, and on February 22, 2011, they again moved for settlement approval, as well as modification of the Court's prior certification order.

Pursuant to the newly proposed agreement, DuPont has agreed to pay $8.3 million to release the Rowe and Scott Plaintiffs' class claims only.  The $8.3 million payment would fund two options for class relief:  a "filter option" and, alternatively, an "incidental payment option."  The filter option would provide class households an in-home water filter system chosen by class

6

counsel,[8] a minimum of ten replacement cartridges,[9] and a $200
check to cover costs associated with installing the filter.   The
incidental payment option, designed for those households who
preferred a different filter system, desired bottled water or
otherwise favored a cash payment, would provide class households
with the cash equivalent of the filter option.   Additionally, the
settlement payment would cover class counsel's fees and costs, as
well as costs associated with the class notice plan and claims
administration.

On March 22, 2011, the Court held a hearing, agreed to
modify its previous certification order,[10] and preliminarily

---

[8]Plaintiffs' Counsel selected the Culligan RC-EZ-4 Undersink
Water Filtration System as a device "capable of effectively and
efficiently reducing and/or removing PFOA from residential
drinking water at the tap."   See Blecher Decl. in Support of
Preliminary Approval at ¶ 3.

[9]Because the entire settlement payment, less attorney fees
and claims administration costs, would be allocated to class
relief, the precise number of replacement cartridges, as well as
the attendant value of the incidental payment option, would
depend on how many class households participated in the
settlement.

[10]Pursuant to Rule 23(c)(1)(C), the Court modified its
certification order, eliminating the strict liability issue for
class treatment per the parties' request.   See Lindsey v.
Memphis-Shelby County Airport Auth., 229 F.3d 1150 (6th Cir.
2000), 2000 WL 1182446, at *7 (noting that "[a] district court
has discretion to redefine a class.").
The Court also approved this amendment to the private
nuisance subclass definition:

Anyone who as of the date of Class Notice of the Settlement
has an ownership interest (meaning owns or leases) in and
occupies a residence located within two miles of the

7

approved the proposed settlement.

**D.    Notice, Opt-Outs and Objections Related to Settlement**

On March 31, 2011, class counsel sent notice of the proposed settlement to 3,705 class member households.  On April 4, 2011, counsel sent class members a separate letter explaining the settlement.  In total, after follow up mailings, class counsel sent notice to 4,248 households.  Counsel sent notice of the settlement to the appropriate state and federal government officials, as required by the Class Action Fairness Act, 28 U.S.C. § 1715(b).  Counsel also established a toll-free telephone line to provide callers with information about the settlement.

The parties' settlement agreement permitted class members to

---

Chambers Works Plant that has a private well for drinking
water that contains PFOA.

The Court similarly modified the public nuisance subclass
definition:

Anyone who <u>as of the date of Class Notice of the Settlement</u>
has an ownership interest (meaning owns or leases) in and
occupies a residence with drinking water supplied by the
Pennsgrove Water System.

The modified definitions reflect the parties' intent of directing
relief to those persons currently residing in the class area.
Concerned that people who previously resided in the class
area might mistakenly believe that they remained class members,
the Court inquired as to counsel's communications with putative
class members.  Counsel represented that they had not sent any
notice that would indicate to such persons that "you are hereby
included in the class."  March 22, 2011 Preliminary Hearing Tr.
9:2-10.  Moreover, as Plaintiffs' counsel rightly argued, even if
a person mistakenly believes that he or she is a class member,
although that person receives no class benefit, he or she retains
the ability to pursue his or her own claims.

opt out of the settlement, providing a May 9, 2011-deadline for both opt-outs and objections.[11]  Prior to the May 9 deadline, 27 individual class members opted out of the settlement.  Class counsel also received four settlement objections.

Samuel Switzenbaum and Pennsgrove Associates have an ownership interest in Rivers Bend Apartments, a 240-unit apartment complex located within two miles of the Chambers Works Plant.  On May 9, 2011, they filed their objections to the settlement.  Ron Keller and Sheila Uhrick, both Rivers Bend employees who also reside in the complex, later joined in these objections.  On May 12, 2011, class counsel also received opt-out forms for Samuel Switzenbaum, Waverly Associates, Pennsgrove Associates and KeyBank, N.A.[12]

**E.  Final Approval of Settlement**

On May 24, 2011, the parties filed the instant motion for final settlement approval.  That same day, Samuel Switzenbaum and Pennsgrove Associates ("the Intervenors") filed a motion to

---

[11]The Court certified the public and private nuisance subclasses pursuant to Rule 23(b)(2), which does not permit class members an <u>absolute</u> right to opt-out of the settlement.  Here, as noted, the parties voluntarily permitted class members the right to opt-out.  <u>See</u> 2 Alba Conte & Herbert Newberg, <u>Newberg on Class Actions</u> § 4:14, at 97 (4th ed. 2002) ("Although the cases permitting opt-outs in (b)(1) and (b)(2) actions are few, a number of circuits recognize that district courts have discretion to permit them.").

[12]After the June 17 final approval hearing, class counsel received one additional request to opt-out of the settlement, dated June 8, 2011.

intervene for purposes of objecting to the settlement.[13]   Class counsel filed a motion seeking $2,766,390 in attorney fees and $886,244.27 in costs.   The parties also jointly filed a motion to strike several settlement objections.

## II.  Discussion

Before addressing the parties' motion for final approval of the settlement, the Court turns to the Intervenors' motion to intervene.

### A.   Motion to Intervene

As all the parties conceded at oral argument, the Intervenors are not class members, and hence, do not release any claim under the settlement.[14]   Generally, "only class members have standing to object to a proposed class settlement."   In re Sunrise Sec. Litig., 131 F.R.D. 450, 459 (E.D.Pa. 1990).   But the Intervenors' status as non-class members does not necessarily limit their ability to intervene for purposes of opposing the settlement.   Federal Rule of Civil Procedure 24(a)(2) permits

---

[13]At oral argument on the motion to intervene, counsel clarified that the purpose of the motion to intervene was to object to the settlement and "act...as a friend of the Court." June 14, 2011 Final Approval Hearing Tr. 7:23-8:2.

[14]The Court notes that Ron Keller and Sheila Uhrick have requested leave to join in the Intervenors' objections.   Although Keller and Uhrick made their request two days after the May 9 deadline, given the circumstances here, the Court nonetheless considers the request as timely and permits Keller and Uhrick to join in the Intervenors' objections.   It appears that Keller and Uhrick are class members who would be bound by the settlement.

intervention as of right to "anyone...who...claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."  Under the rule, a party seeking to intervene as of right must establish four elements:

> (1) the application for intervention is timely; (2) the applicant has a sufficient interest in the litigation; (3) the interest may be affected or impaired, as a practical matter by the disposition of the action; and (4) the interest is not adequately represented by an existing party in the litigation.

In re Community Bank of Northern Virginia, 418 F.3d 277, 314 (3d Cir. 2005) (quoting Harris v. Pernsley, 820 F.2d 592, 596 (3d Cir. 1987)).

"Timeliness of an intervention request 'is determined by the totality of the circumstances.'"  Id. (quoting United States v. Alcan Aluminum, Inc., 25 F.3d 1174, 1181 (3d Cir. 1994)).  Courts consider:  "(1) the stage of the proceeding; (2) the prejudice that delay may cause the parties; and (3) the reason for the delay."  Id. (citing Mountain Top Condo. Ass'n v. Dave Stabbert Master Builder, Inc., 72 F.3d 361, 369 (3d Cir. 1995)).  "Although the point to which the litigation has progressed is one factor to consider, it is not dispositive."  Alcan Aluminum, Inc., 25 F.3d at 1181.  "The time frame in which a class member

11

may file a motion to intervene challenging the adequacy of class representation must be at least as long as the time in which s/he may opt-out of the class." In re Community Bank, 418 F.3d at 314; see also McKowan Lowe & Co. v. Jasmine, Ltd., 295 F.3d 380, 384 (3d Cir. 2002)(quoting American Pipe & Const. Co. v. Utah, 414 U.S. 538, 552 (1974))("Not until the existence and limits of the class have been established and notice of membership has been sent does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case."). Thus, where a motion to intervene "was within the opt-out period, it was presumptively timely." In re Community Bank, 418 F.3d at 314. In other words, "to the extent there is a temporal component to the timeliness inquiry, it should be measured from the point which an applicant knows, or should know, its rights are directly affected by the litigation, not...from the time the applicant learns of the litigation." Alcan Aluminum, Inc., 25 F.3d at 1182.

The Intervenors claim they first learned of the settlement terms when class counsel sent notice of the settlement. Thus, given that the claim objection and opt-out period concluded on May 9, 2011, and the Intervenors - who are not members of the class - filed their motion only fifteen days later, the Court finds their application for intervention to be timely.

The Court also concludes that the Intervenors have an interest in this litigation that, as a practical matter, may be affected by the settlement. Although "the precise nature of the interest required to intervene as of right has eluded precise and authoritative definition ... an intervenor's interest must be one that is 'significantly protectable.'" Mountain Top Condo. Ass'n, 72 F.3d at 366 (quoting Donaldson v. United States, 400 U.S. 517, 531 (1971)). "Significantly protectable" means that "'the interest must be a legal interest as distinguished from interests of a general and indefinite character.'"[15] Id. (quoting Harris, 820 F.2d at 601). In other words, "'[t]he applicant must demonstrate that there is a tangible threat to a legally cognizable interest to have the right to intervene.'" Id. (quoting Harris, 820 F.2d at 601 (citations omitted)).

The Intervenors have an ownership interest in Rivers Bend Apartments, a 240-unit complex with drinking water supplied by

---

[15]Generally, "a mere economic interest in the outcome of the litigation is insufficient to support a motion to intervene." Mountain Top Condo. Ass'n, 72 F.3d at 366 (citing Alcan Aluminum, 25 F.3d at 1185 ("Some courts have stated that a purely economic interest is insufficient to support a motion to intervene."); New Orleans Public Service, Inc. v. United Gas Pipe Line Co., 732 F.2d 452, 464 (5th Cir. 1984)(en banc)("It is plain that something more than an economic interest is necessary.")). "Thus, the mere fact that a lawsuit may impede a third party's ability to recover in a separate suit ordinarily does not give the third party a right to intervene." Id. (citing Hawaii-Pacific Venture Capital Corp. v. Rothbard, 564 F.2d 1343, 1346 (9th Cir. 1977)).

the Pennsgrove Water System.  The Court defined the <u>Scott</u> class
as follows:

> Anyone who as of the date of Class Notice of the Settlement
> has an ownership interest (meaning owns or leases) in and
> occupies a residence with drinking water supplied by the
> Pennsgrove Water System.

Again, although the Intervenors, themselves,[16] are not class
members, because they do not reside in any of the Rivers Bend
units, the parties' settlement offers Rivers Bend tenants the
option of choosing a Culligan RC-EZ-4 Undersink Water Filtration
System.  At oral argument, counsel for the Intervenors
represented that the installation of this system in a Rivers Bend
Apartment unit would require drilling a hole in the unit's sink.
<u>See</u> June 14, 2011 Final Approval Hearing Tr. 46:18-20 ("This is a
filter that does require drilling and modification of the
plumbing, and that's what they are proposing.").  Moreover,
Switzenbaum, whom the Court permitted to testify, asserted that
the Intervenors would not allow the Culligan RC-EZ-4 Undersink
Water Filtration System to "be put on our property."  <u>Id.</u> at
39:1-2.  Thus, because the settlement provides for the potential
installation of the filtration system on the Intervenors'
tenants' sinks, the settlement may, as a practical matter, impede
the Intervenors' ability to protect their ownership interest,

---

[16]The Court notes, again, that two class members have joined
in the Intervenors' objections.

i.e., the integrity of the Rivers Bend Apartment units' plumbing. This interest is not adequately represented by the parties to the settlement. "Where the rights of third parties are affected, it is not enough to evaluate the fairness of the settlement to the settling parties; the interests of such third parties must be considered." Eichenholtz v. Brennan, 52 F.3d 478, 482 (3d Cir. 1995). Accordingly, the Court grants the Intervenors' motion to intervene and will consider their objections to the settlement.

**B.   Intervenors' Objections to the Settlement**

The Intervenors raise several objections to the settlement agreement:  (1) the parties' failure to disclose the settlement terms of the class representatives' <u>individual</u>, non-class claims violates Federal Rule of Civil Procedure 23(e)(3); (2) the parties provided inadequate notice of the proposed settlement; and (3) the settlement does not provide adequate relief to the class members.  For the reasons that follow, the Court overrules all three objections.

**1.   The Rule 23(e)(3) Objection**

In their preliminary and final approval briefs, the parties represented that the Rowe and Scott representative Plaintiffs were in the process of settling their individual non-class claims separately.  The parties did not, however, disclose any details of such settlements.  The Intervenors aver that these individual "side" settlements violate Federal Rule of Civil Procedure

15

23(e)(3) and potentially create an intra-class conflict between
the class representatives and class members, which mandates
disapproval of the settlement.[17]   Rule 23(e)(3) requires that
"[t]he parties seeking approval must file a statement identifying
any agreement made in connection with the proposal."   The

---

[17]The Intervenors have also suggested that "if Landlords are
included in the Class definition, there is an intra-class
conflict between landlords and their tenants, requiring separate
counsel for each."   See Motion to Intervene, Ex. A.   The
Intervenors press their position that "[l]andlords have the
incentive to protect the value of the entire property while
[t]enants have the incentive to opt to receive the $800 in cash,
since they have no vested interest in the entire property."   The
Court rejects this proposition.   Both landlords and tenants who
reside in the class area would surely share the common objective
of minimizing exposure to PFOA.   See 4 Newberg on Class Actions §
11:41, at 97 ("The interests of the various plaintiffs do not
have to be identical to the interests of every class member; it
is enough that they share common objectives and legal or factual
positions.").

Moreover, at oral argument, all parties agreed that the
Intervenors are not class members, confirming that the phrase
"owns or leases and occupies" should be read in the conjunctive,
applying only to those who own or lease and occupy a residence.
The Intervenors argued that the phrase "owns or leases and
occupies" in the Class Notice was vague, noting that the phrase
could be read in the disjunctive, including owners, as well as
those who lease and occupy a residence.   The Court does not find
this imprecision in the class definition to be prejudicial.
Because the parties' interpretation of requiring both residence
and occupancy errs on the side of being under inclusive, there is
no danger that the class notice would fail to alert a putative
class member that he or she is relinquishing a right under the
settlement.   Even if the Intervenors are correct - that the
notice is vague - and a person could mistakenly believe that he
is a class member and submits a claim under this settlement
(e.g., he is an owner only who does not occupy the residence),
such a person would surely be informed not only that he is not
entitled to class relief, but also that he is not bound by the
class release.

Committee Note to the 2003 amendments explains the import of the
Rule:

> Subdivision [(e)(3)] requires parties seeking approval of a
> settlement...to file a statement identifying any agreement
> made in connection with the settlement.  This provision does
> not change the basic requirement that the parties disclose
> all terms of the settlement or compromise that the court
> must approve under Rule 23(e)(1).  It aims instead at
> related undertakings that, although seemingly separate, may
> have influenced the terms of the settlement by trading away
> possible advantages for the class in return for advantages
> for others.  Doubts should be resolved in favor of
> identification.

Thus, the Rule aims at requiring disclosure of "side agreements"

that "may have influenced the terms of the settlement by trading

away possible advantages for the class in return for advantages

for others."  In re Initial Public Offering Sec. Litig., 226

F.R.D. 186, 204 (S.D.N.Y. 2005).  That is not to say, however,

that any agreements must be disclosed.  Rather, "[t]he spirit of

Rule 23[(e)(3)] is to compel identification of any agreement or

understanding that might have affected the interests of class

members by altering what they may be receiving or foregoing."

Manual for Complex Litigation (Fourth) § 21.631, at 319 (4th ed.

2004)(emphasis added).  Such example would include side

agreements that "reveal additional funds that might have been

paid to the class that are instead paid to selected claimants or

their attorneys."  Id.

In order to address this objection, the Court ordered that

the parties submit the class representatives' individual settlement agreements for review <u>in</u> <u>camera</u>.  The Court has reviewed these agreements and finds no evidence of collusion or threat of conflict.  As the parties had correctly represented to the Court, these agreements release numerous, individual claims brought by class representatives that were not certified for class treatment.  The agreements do not predicate the release of such claims on the Court's approval of the class settlement or otherwise implicate the class settlement.  Nor do the agreements demonstrate that the class representatives received disproportionate relief when compared to the relief provided to the class.  In sum, the Court is satisfied that the class representatives' individual settlement agreements did not influence the terms of the class settlement by trading away possible advantages for the class in return for advantages for themselves.

## 2.   The Notice Objection

Pursuant to Federal Rule of Civil Procedure 23(e)(1), "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal."  The Intervenors object that the notice failed to give absent class members a meaningful opportunity to evaluate the proposed settlement because:  (1) the notice failed to "disclose any special benefits

18

provided to the class representatives"; and (2) the time period available for class members to opt-out or object to the settlement was insufficient.[18]

First, as discussed, the representative plaintiffs did not receive any "special benefits" under the class settlement agreement.  Thus, there can be no argument that the class notice was deficient for failing to disclose a settlement term that did not exist.

The Court also finds that the parties provided class members with a sufficient opt-out and objection period.  Class counsel provided a certification stating that counsel sent the class notice on March 31, 2011, which directed potential class members to postmark their objections or settlement exclusion requests by May 9, 2011.  On April 4, 2011, counsel sent class members a second letter explaining more about the settlement terms.  The Court received six objections and 27 settlement exclusion requests by the May 9 deadline.  Since the fairness hearing,

_____

[18]The Court understands the Intervenors to have abandoned their objection that the settlement release is overly vague or that the settlement release applies to future occupants.  As clarified at oral argument, the settlement here releases only class claims seeking injunctive relief for private and public nuisance who reside in the class area on the date notice was sent.  See June 14, 2011 Final Approval Hearing Tr. 83:18-25 ("This settlement does not in any way release any claims beyond the class claims for injunctive relief only on public and private nuisance.").

19

counsel has received only one additional opt-out request.[19]

Providing adequate class notice is among the "important ...fiduciary duties shared by counsel and the court" and "ensure[s] that absentee class members have knowledge of proceedings in which a final judgment may directly affect their interests." Greenfield v. Villager Industries, Inc., 483 F.2d 824, 832 (3d Cir. 1973). Indeed, sufficient notice, which is mandated by Rule 23, also raises important constitutional concerns as well. "A class member must have certain due process protections in order to be bound by a class settlement agreement." In re Diet Drugs Products Liability Litig., 431 F.3d 141, 145 (3d Cir. 2005). Absent class members are denied due process protections "where it cannot be said that the procedure adopted[] fairly insures the protection of the interests of absent parties who are to be bound by it." Id. (quoting Hansberry v. Lee, 311 U.S. 32, 42 (1940)). Where a settlement provides for an opt-out right, due process protections include "adequate representation by the class representatives, notice of the class proceedings, and the opportunity to be heard and participate in the class proceedings." Id. (citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985)). The Court finds that class members have received these due process

---

[19]The parties have not indicated whether they object to this request on timeliness grounds.

protections.

Despite the fact that the subclasses were certified pursuant to Rule 23(b)(2), the parties provided class members with both individual notice <u>and</u> the ability to opt-out of the settlement. Moreover, class members received two, separate mailings alerting them to the settlement.  The second letter instructed class members to contact counsel as soon as possible if they did not receive the class notice.

The Intervenors contend that the issues involved in the settlement are complex, thereby demanding highly specialized, scientific knowledge to determine the efficacy of the water filtration system offered as class relief.  Thus, they appear to argue, a thirty-five day period is insufficient for a class member to make a decision.  The Intervenors cite class counsel's April 4 letter, which contained a disclaimer regarding the filtration system, as indicative of the difficult choice that class members were asked to make during the opt-out period.

The Court disagrees.  First, counsel's disclaimer was followed by the direction to contact counsel with questions about the water filter system.  <u>See</u> Byrne Decl. in Support of Final Approval, Ex. 2.  The class notice and counsel's subsequent letter adequately described the stakes of the litigation, the settlement being offered and how class members could request more information.  <u>See</u> 4 <u>Newberg on Class Actions</u> § 11:41, at 99

21

(quoting <u>Petrovic v. Amoco Oil Co.</u>, 200 F.3d 1140, 1149 (8th Cir.
1999)) ("the mailed notice provided a reasonable summary of the
stakes of the litigation, and class members could easily acquire
more detailed information...through the telephone number that was
provided.  Due process requires no more.").  Class members had
thirty-five days[20] to decide whether to object or opt-out of the
settlement.  See <u>Manual for Complex Litigation</u> § 21.321, at 298
("Courts usually establish a period of thirty to sixty days (or
longer if appropriate) following mailing or publication of the
notice for class members to opt-out.").  The Court considers two
mailings, in addition to a thirty-five day opt-out and objection
period, to have provided class members with reasonable notice.[21]

---

[20]Counting back from March 31, the date that the letter was
actually mailed, the class members had 39 days to decide whether
to opt-out of the settlement or object.

[21]The Court acknowledges the Intervenors' concern that
individual notices were apparently not mailed to tenants at the
Rivers Bend Apartment Complex until April 28, 2011, providing
tenants at this complex a more limited window to object or opt-
out of the settlement.  The Court is further mindful that class
counsel mailed 543 notices at some point after the March 31
initial mailing.  See Byrne Decl. in Support of Final Approval at
¶ 8.  Exactly when such notices were mailed is not clear from the
record, but counsel does represent that approximately 76% of
these later-filed notices were sent to apartments or multi-family
dwellings, such as the Rivers Bend Apartment Complex.  <u>Id.</u> ¶ 11.
The Court does not consider this deviation, affecting a
fraction of the class, to require sending a new class notice.
First, it is not evident that, even with the late notice, that
class members were deprived of their due process rights.  As set
forth above, the letter instructed the class member to contact
class counsel with any questions.  The record does not
demonstrate that any class member contacted Plaintiffs' counsel
to request more time to file an objection or opt-out.  Surely, if

### 3.   Objection to the Settlement Relief

Finally, the Intervenors, citing In re GMC Pick-Up Truck Fuel Tank Products Liability Litigation, 55 F.3d 768, 818-19 (3d Cir. 1995), argue that the settlement affords class members disproportionate relief compared to the serious allegations made in the Rowe and Scott Complaints.  In GMC Pick-Up Truck, the Third Circuit held that a proposed settlement was "not fair, reasonable, or adequate" because "[t]he case was simply settled too quickly with too little development on the merits" for the district court to simply accept the estimated value of the settlement relief.  Id.

The case before this Court stands in marked contrast to GMC Pick-Up Truck.  Only after five years of exhaustive, contentious litigation, where liability has been vigorously disputed, did the parties come to the Court with a settlement agreement (after

---

a class member had contacted counsel requesting more time, counsel would be duty-bound to raise such issues with the Court. Moreover, requiring new class notice would cause class members to incur additional expense and would further delay the relief afforded under the settlement.  Plaintiffs' counsel represented at trial that re-noticing would require significant time, effort and expense.  See June 14, 2011 Final Approval Hearing Tr. 130:3-4 (representing that the first notice mailing "triggered hundreds upon hundreds of phone calls," requiring ten full-time employees to handle these calls and that "re-noticing at this stage would trigger probably double the number of calls...."). Finally, although it is not dispositive to the Court's decision, it bears noting that, to date, the Court has not received any new settlement objections, and class counsel received only one, additional opt-out request.  If the Court receives additional requests for settlement exclusion, the Court will, of course, consider the reason for the request's untimeliness.

having had an earlier settlement rejected).  The parties had
filed extensive pre-trial motions, including a motion seeking
summary judgment of the class claims, as well as motions in
limine to preclude competing experts' opinions.  This is simply
not a case with "too little development on the merits."

The Intervenors also presuppose, quite wrongly, that the
class would receive the injunctive relief sought in the Rowe and
Scott Complaints if the cases proceed to trial.  As this Court
has noted on many occasions, the merits of Plaintiffs'
allegations regarding the impact of PFOA on human health have
been hotly contested, leaving DuPont's liability far from
certain.  Thus, the Intervenors' general objection that the
filter system offered to the class fails to approximate the
relief that Plaintiffs originally sought (and Intervenors assume
will obtain) does not warrant rejection of the settlement.

The Intervenors also object that the settlement provides
only one source of filtered water, further noting that if a
household installs the filter on the cold water line, hot water
from the same faucet will not be filtered.  These objections
again assume, wrongly, that PFOA has been established as harmful
to human health.  At the final approval hearing, over Plaintiffs'
objection,[22] DuPont introduced a declaration from its science

_____

[22]The Court permitted the declaration to be introduced, over
Plaintiffs' objection, as relevant to determining the risk
Plaintiffs' face in seeking to establish liability, a factor the

24

director, Robert Rickard, Ph.D., D.A.B.T.:

> Based on extensive health and toxicological studies, DuPont does not believe that PFOA exposure poses a health risk to the general public.  Human studies have evaluated many health endpoints across a wide range of exposed populations, and, while some associations have been reported, no human health effects are known to be caused by PFOA.

Rickard Decl. ¶ 8.  Dr. Rickard further noted that DuPont's research results were "consistent with the occupational studies that do not find any causal link between PFOA and human disease even at PFOA blood levels far exceeding those found in the general population."  Id. at ¶ 18.  Given the parties' genuine dispute regarding PFOA's health effects, the Court cannot say that the filter option offered under the settlement – which would limit, although not eliminate, class members' exposure to PFOA – falls outside the range of reasonable compromise.  Moreover, it bears repeating that the class members release only their class claims for injunctive relief based on private and public nuisance under this settlement, no other claims.

The Intervenors also object that the settlement provides inadequate relief for tenants who must consult with landlords regarding the installation of the filters in their rental units, and fault class counsel for failing to discuss with landlords the viability of installing filters in rental properties.  These

_____

Court must consider to determine whether this settlement is fair, reasonable and adequate.  See Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975).

objections were the subject of considerable discussion at the fairness hearing, and the Court strived to address this legitimate concern.  In response to this concern, the parties proposed to modify the class claim form to read as follows:

**NOTE:  IF YOU RENT AND OCCUPY YOUR RESIDENCE:**

Before making your selection below, you should contact the landlord/owner of your property ("Landlord") and determine what your Landlord may require or request with respect to the installation of any type of water filter system at your residence to make sure you comply with any restrictions or requirements of your lease or otherwise that relate to any such filter installations.  For example, some landlords may prohibit or request that tenants not install filter systems that require drilling or are viewed as permanent fixtures.  Thus, because the particular water filter package recommended by Class Counsel and included as part of the Water Filter Option includes a specific Culligan filter system that may require drilling to install (depending on your particular sink or property type), you or your Landlord may prefer/request/require that you not select the Water Filter Option and that any water filter system to be installed on your rental property be limited or restricted to some alternate type(s).  In that case, if you desire to purchase such an alternate water filter system, you would need to select the Incidental Payment Option through which you could use such payment to purchase whatever alternative filter system you or your Landlord prefers/requests/requires.  Information describing many of the commercially-available systems for filtering PFOA from your water (including the Culligan RC-EZ-4© system recommended by Class Counsel and included in the Water Filter Option package) can be found in a report prepared by the Minnesota Department of Health at that Agency's public website (http://www.health.state.mn.us/divs/eh/wells/waterquality/po udevicefinal.pdf).  Information identifying and describing additional, commercially available water filter systems for PFOA is also provided in a report prepared by 3M Company, available at ftp://mdh-ftp.health.state.mn.us/pub/pdf/E070079FinalReport.pdf. Among the available water filter systems evaluated for PFOA removal in that 3M report are several different systems that can be simply attached to the end of the drinking water

faucet in your home, without the need for any drilling. Additional information is available in the Frequently Asked Questions document included with this Claim Form and by contacting the Claims Administrator's office at 1-800-345-0837.

PLEASE CAREFULLY REVIEW/DISCUSS THIS INFORMATION WITH YOUR LANDLORD BEFORE SELECTING YOUR CLASS BENEFITS.

<u>See</u> Bilott Decl. in Support of Final Approval, Ex. 3.

The Court accepts this proposal with one modification, as discussed below.  This notice to tenants, written in bold and capitalized letters, should allay the concerns voiced by the Intervenors.  It instructs class members who are tenants to discuss available filters with their landlords prior to installation.  The web sites provided also list other available systems that might be preferred by class members or landlords. The Court thus approves the modified claim form and also approves the "Frequently Asked Questions" form, which also instructs class members who lease and occupy property in the class area to discuss filter installation with their landlords and offers information about other available filter systems.

Subsequent to the fairness hearing, the Court received a letter from Switzenbaum supplementing the Intervenors' objection. In his letter, Switzenbaum advised the Court that the Intervenors would advise the tenants at the Rivers Bend Apartment Complex that no water filter systems may be installed.  Accordingly, to better protect the Intervenors, the Court directs that the claim form states, after the second sentence, in bold, the following:

**"Please note: If you are a member of Rivers Bend Apartment Complex, the landlord will not permit the installation of any type of water filter system at your residence."**

The Intervenors next object on the grounds that improperly installed filter systems will result in landlords suffering property damage. The fact that the Intervenors will not permit the installation of the filter system moots this objection as to the Intervenors, at least. Moreover, as to all landlords, the Filter Option provided under the settlement provides class members with $200 to pay for professional installation of the filter. Certainly, if any tenant did cause damage to a rental unit, landlords are not without a legal remedy.

The Intervenors also assert that the proposed settlement interferes with a landlord's ability to charge uniform rent by creating distinctions between otherwise identical units and leaves landlords with the responsibility of maintaining or inspecting filters. This objection has no merit. The Court fails to understand why the installation of a water filter system by a class member should result in appreciable rent disparities. Even so, as discussed above, the landlord has the final say in whether to allow the installation of the filter system at all, and as such, the objection is moot as to the Intervenors, and superficial as to other landlords.

Finally, the Intervenors object that the settlement does not offer class members a range of water systems vetted by counsel. Class counsel identified the Culligan RC-EZ-4 Undersink Water Filtration System after investigating commercially available, point-of-use water filtration systems. Counsel relied on two studies, which have been identified for class members in the revised claim form: (1) a 2007 study conducted by the 3M Company (the "3M Study") and (2) a 2008 study generated by the Minnesota Department of Health (the "Minnesota Study"). The 3M Study evaluated ten different point-of-use water treatment devices based on their removal of fluorochemicals from water. The Minnesota study evaluated eleven such devices, including the Culligan system identified by class counsel, which the study found effectively removed PFOA to below laboratory detection limits. Clearly, class counsel undertook a reasonable investigation of commercially available filtration systems to arrive at their conclusions. In any event, the revised claim form alerts class members that there are a range of water systems available for purchase, and the ultimate decision rests with the class member.

In sum, after careful review, the Court does not find that any of the Intervenors' objections warrant the rejection of this

29

settlement.[23]

## C.   Motion to Strike Objections

DuPont and the Rowe and Scott Plaintiffs ask the Court to strike the only other objections made to the proposed settlement, those lodged by ShaKai Ellis and Kenneth W. Jordan.   Jordan does not reside within two miles of the Chambers Works Plant, and thus falls outside the class definition.   Ellis submitted an opt-out request, exempting her from the settlement.

Generally, as has already been noted, "only class members have standing to object to a proposed class settlement."   In re Sunrise Sec., 131 F.R.D. at 459.   The Fourth Circuit explained:

> Beginning from the unassailable premise that settlements are to be encouraged, it follows that to routinely allow non-class members to inject their concerns via objection at

_____

[23]The Intervenors have also suggested that the very existence of a settlement has caused property owners in the class area to suffer damages.   Because there has been no finding of liability, and indeed, DuPont has denied any liability in the settlement agreement, the Intervenors' position is no different from arguing that the filing of the Rowe and Scott Complaints has caused class members to suffer damages.   This is no basis to reject a settlement and require that the case proceed to trial.   Indeed, taking the Intervenors' objection to its logical conclusion, a finding of no liability at trial would be the only result that would address the Intervenors' concern, a result that no one can predict.   There is an "overriding public interest in settling class action litigation," In re Pet Food Products Liability Litig., 629 F.3d 333, 351 (3d Cir. 2010)(quoting In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 535 (3d Cir. 2004)), and courts should not force the parties to litigate the issue of liability just because an objector believes that the litigation will conclude to its benefit.

the settlement stage would tend to frustrate this goal.
Were the rule as [the objector] contends, every objection
from a non-class member would trigger an examination by the
court of the effects of the proposal on the objector.
[Kusner v. First Pennsylvania Corp., 74 F.R.D. 606, 611
(E.D. Pa. 1977)].  We cannot conceive that the drafters of
the Rules intended to permit such eleventh-hour expansion of
class actions.  We hold, therefore, that non-class members
have no standing to object, pursuant to a Rule 23(e) notice
directed to class members, to a proposed class settlement.
Interjection of the opposing views of non-class members
should proceed via intervention under Rule 24.

Gould v. Alleco, Inc., 883 F.2d 281, 284 (4th Cir. 1989)(footnote

omitted).

Indeed, two non-class members have proceeded pursuant to

Rule 24, causing the Court to consider the objections of

Switzenbaum and Pennsgrove.  Given, however, that Jordan resides

outside the class area, and that Ellis has opted out of the

settlement, the Court will grant the parties' motion to strike

these objections.[24]

**D.   Motion for Final Settlement Approval**

Federal Rule of Civil Procedure 23(e) requires the Court to

approve any class action settlement.  The Rule recognizes that

the district court "acts as a fiduciary, guarding the claims and

rights of the absent class members."  In re Pet Food, 629 F.3d at

---

[24]In doing so, the Court is mindful that the objections
raised by the Intervenors essentially mirror those raised by
Jordan, who is also a landlord, and Ellis, who objected to the
adequacy of the settlement.  Thus, as a practical matter, the
Court has considered the Jordan and Ellis objections de facto.

349-50(quoting <u>Ehrheart v. Verizon Wireless</u>, 609 F.3d 590, 593 (3d Cir. 2010)); <u>see also</u> <u>Amchem Products, Inc. v. Windsor</u>, 521 U.S. 591, 623 (1997)(quoting 7B Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, <u>Federal Practice and Procedure</u> § 1797, at 340-341 (2d ed. 1986))(noting that the Rule 23(e) inquiry "protects unnamed class members 'from unjust or unfair settlements affecting their rights when the representatives become fainthearted before the action is adjudicated or are able to secure satisfaction of their individual claims by a compromise.'").  The Court thus considers whether the settlement proposed is fair, reasonable and adequate.

>     1.    **The Settlement Agreement**

>     a. **<u>Girsh</u> and <u>Prudential</u> Analysis**

The proposed class settlement is entitled to a presumption of fairness.  The Third Circuit has articulated a four-part test for determining when this presumption should apply:

> We have previously directed a district court to apply an initial presumption of fairness when reviewing a proposed settlement where: "(1) the settlement negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."

<u>In re Warfarin</u>, 391 F.3d at 535 (quoting <u>In re Cendant Corp. Litig.</u>, 264 F.3d 201, 232 n. 18 (3d Cir. 2001)).  These four elements are met here.

The record is clear that the parties, represented by experienced class counsel, negotiated this settlement at "arms length" and in good faith.  The parties entered into the settlement after discovery had been completed and a raft of motions had been filed.  Finally, although there has been some argument that the objection period was deficient, the Court nonetheless finds the number of objections to be small.[25]

Additionally, the Third Circuit has identified nine factors that courts must consider when evaluating the fairness of a class action settlement:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

In re Pet Food, 629 F.3d at 350 (quoting Girsh, 521 F.2d at 157 (internal quotation marks and alterations omitted)).  The settling parties bear the burden of establishing that the settlement satisfies these "Girsh factors."  Id. (citing GMC Pick-Up Truck, 55 F.3d at 785).

---

[25]Indeed, even if all 543 class households, whose class notice mailings were apparently delayed, objected to the settlement, such objections would represent only 13% of the class households.

Although the Court must make findings as to the nine <u>Girsh</u> factors, the Court should also consider other factors where appropriate, including:

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt-out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

<u>Id.</u> (quoting <u>In re Prudential Ins. Co. of Am.</u>, 148 F.3d 283, 323 (3d Cir. 1998)).  When weighing the above considerations, the Court must conduct its own evaluation and may not "substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms."  <u>Id.</u>  To this end, "courts may find it necessary to drill down into the case and into the agreement."  <u>Id.</u> (citing <u>In re Prudential</u>, 148 F.3d at 317). Moreover, contrary to the argument urged by the Intervenors, the Court should not withhold approval simply because the settlement may not be the best settlement, or a better settlement might have been reached. If the perfect settlement were the test for court approval, rarely would a class action settlement be approved because inherent in each settlement is some relinquishment of a

party's firmly held position or positions.

The Court now weighs each <u>Girsh</u> factor, as well as relevant <u>Prudential</u> factors, as discussed below.

> **a.   The Complexity, Expense and Likely Duration of the Litigation**

"This factor is intended to capture 'the probable costs, in both time and money, of continued litigation.'" <u>GMC Pick-Up Truck</u>, 55 F.3d at 812 (quoting <u>Bryan v. Pittsburgh Plate Glass Co.</u>, 494 F.2d 799, 801 (3d Cir. 1974)). "By measuring the costs of continuing on the adversarial path, a court can gauge the benefit of settling the claim amicably." <u>Id.</u>

The parties have already expended significant resources litigating the class claims settled here. Plaintiffs initiated suit over five years ago, and in that time have exchanged approximately three million documents, retained numerous experts, attended more than fifty depositions and engaged in extensive motion practice, including most recently a motion for summary judgment and several motions <u>in limine</u> to exclude competing experts' testimony. Even presuming that Plaintiffs' class claims would survive summary judgment, a lengthy trial would surely follow.

The issues to be litigated would be complex, to say the least. To establish a right to injunctive relief, Plaintiffs would bear the burden of demonstrating irreparable, class-wide

35

harm.  In other words, Plaintiffs would need to establish the
harmful effects of PFOA, an arduous task before a jury.  At
trial, the parties would most certainly engage in a "battle of
the experts," which inevitably would raise difficult questions of
law and fact.  The continued retention of these experts would
come at a burdensome expense.  Moreover, the length of the trial,
and the high likelihood of an appeal, would further delay any
relief the class might eventually receive.

By contrast, the settlement proposed here provides class
members with a tangible benefit without further delay or expense.
The Court thus finds that this factor weighs in favor of
accepting the settlement.

### b.   The Reaction of the Class to the Settlement

"In an effort to measure the class's own reaction to the
settlement's terms directly, courts look to the number and
vociferousness of the objectors."  GMC Pick-Up Truck, 55 F.3d at
812.  Generally, where class members fail to object to a
settlement, courts interpret such silence as "tacit consent to
the agreement."  Id. (quoting Bell Atlantic Corp. v. Bolger, 2
F.3d 1304, 1313 n.15 (3d Cir. 1993)).  The Third Circuit has
recognized, however, that a small number of objectors should not
necessarily cause a court to infer overwhelming support for a
settlement:  "the practical realities of class actions has led a

36

number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." <u>Id.</u> (citing <u>In re Corrugated Container Antitrust Litig.</u>, 643 F.2d 195, 217-18 (3d Cir. 1981); <u>In re General Motors Interchange Litig.</u>, 594 F.2d 1106, 1137 (7th Cir. 2008)).

Class counsel mailed both the class notice and letter from counsel separately.  The later-filed letter from counsel directed class members that they should have already received the class notice.  Counsel received twenty-seven individual opt-out requests prior to the deadline provided in the notice.  Counsel received four additional opt-out requests after the opt-out deadline but before the final approval hearing.  The Court notes, however, that none of these requests appear to be from class members.  Counsel also received one additional opt-out request after the hearing.  Even if the Court considered all of these opt-out requests as representing class households, those seeking settlement exclusion represent only 0.75% of the class.

Counsel received a similarly small number of objections to the settlement.  In total, six persons, or entities, lodged objections.  As discussed, the Court has considered and overruled the several objections filed by four of these objectors.  The Court struck the objections lodged by the remaining two objectors because they were not class members.  Nonetheless, if the Court considered these six objectors as representing class households,

such objectors represent only 0.14% of the class.

As discussed above, however, legitimate concerns have been raised about the adequacy of the objection and opt-out period, i.e., whether it permitted class members sufficient time to make an informed choice regarding the settlement.  But even with the late notice, the record does not demonstrate that any class member contacted Plaintiffs' counsel to request more time to file an objection or opt-out.  The Court further notes that since the fairness hearing, counsel has apparently received only one additional opt-out request.  Still, given the concerns raised, the Court will not consider the low level of requests for exclusion and objections as demonstrative of the overwhelming approval of the class.  Nonetheless, the Court does find that the low number of opt outs or objections demonstrates that class members generally approve the settlement.

### c.    The Stage of the Proceedings and the Amount of Discovery Completed

This factor "captures the degree of case development that class counsel have accomplished prior to settlement" so that "courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." GMC Pick-Up Truck, 55 F.3d at 813.  As the Court has noted over and over again, the parties had completed discovery and a summary judgment motion was pending prior to the parties' agreement to

settle.  Class counsel were thus well-positioned to evaluate the merits of this litigation when negotiating the proposed settlement.  See, e.g., In re Warfarin, 391 F.3d at 537 (agreeing that class counsel adequately appreciated the merits of the case before negotiating settlement where counsel had pursued litigation for over three years).  Given that the parties only negotiated the proposed settlement on the eve of trial, the Court finds that this factor weighs strongly in favor of accepting the parties' proposal.

### d.   The Risks of Establishing Liability and Damages

These factors require the Court to evaluate "the risks of establishing liability" against "the potential rewards (or downside) of litigation...had class counsel elected to litigate the claims rather than settle them." GMC Pick-Up Truck, 55 F.3d at 814.  Thus, the Court must assess the "expected value of litigating the action rather than settling it at the current time." Id. at 816.  Were this litigation to continue, the Court finds that establishing liability and an entitlement to injunctive relief present Plaintiffs with significant challenges.

As has been noted, prior to settlement, DuPont moved for summary judgment.  The Court is mindful that DuPont resolved similar litigation by dispositive motion.  See Rhodes v. E.I. du Pont de Nemours and Co., 636 F.3d 88, 95 (4th Cir. 2011)

39

(affirming district court's grant of summary judgment to DuPont, dismissing private and public nuisance claims based on PFOA exposure).  Presuming, however, that Plaintiffs successfully opposed summary judgment, unfavorable rulings on DuPont's motions in limine to exclude expert testimony could seriously impede the Plaintiffs' ability to establish liability and damages.

Class counsel concede in their brief that if this litigation continues, Plaintiffs would "face significant and perhaps meritorious defenses based on the facts and the law."  See Br. in Support of Final Approval at 21.  To establish liability for private nuisance, Plaintiffs must demonstrate a "significant harm" such that "normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable..."  Restatement (Second) of Torts § 821F, cmt. d.  To establish liability for public nuisance, Plaintiffs must demonstrate a "special injury," i.e., a "harm of a kind different from that suffered by other members of the public."  In re Lead Paint Litig., 191 N.J. 405, 426 (2007)(quoting Restatement (Second) of Torts § 821C(1)).

DuPont introduced evidence in the record at the fairness hearing suggesting that PFOA research, at best, demonstrates that the effects caused by PFOA are inconclusive and, at worst, that

40

PFOA is not harmful to humans.[26]  Such uncertainty presents a

serious challenge for Plaintiffs seeking to establish liability

for nuisance, as well as irreparable harm, such that Plaintiffs

would be entitled to injunctive relief.  Plaintiffs may receive

nothing if these matters were resolved on their merits.  By

contrast, the proposed settlement provides Plaintiffs with a

tangible benefit.  Given the risks involved, the Court considers

the class members to be best served by the proposed settlement.

### e.   The Risks of Maintaining the Class Action Through the Trial

"'[T]he prospects for obtaining certification have a great

impact on the range of recovery one can expect to reap from the

[class] action.'"  In re Warfarin, 391 F.3d at 537 (quoting GMC

Pick-Up Truck, 55 F.3d at 817).   Thus, "this factor measures the

likelihood of obtaining and keeping a class certification if the

action were to proceed to trial."  Id.

DuPont continues to maintain that the Court improperly

certified both the public and private nuisance subclasses and

---

[26]As previously noted, DuPont introduced a declaration from
its science director, Dr. Rickard, who concluded "[b]ased on
extensive health and toxicological studies" that "no human health
effects are known to be caused by PFOA."  Rickard Decl. at ¶ 8.
Dr. Rickard further noted that DuPont's own research results were
"consistent with the occupational studies that do not find any
causal link between PFOA and human disease even at PFOA blood
levels far exceeding those found in the general population."  Id.
at ¶ 18.

unsuccessfully sought leave to appeal the Court's certification order.  DuPont would likely maintain this defense throughout trial and any appeal.  Indeed, prior to the settlement, DuPont filed a motion to decertify the private nuisance subclass.  The Court thus finds that the continued litigation of this matter does pose a risk of decertification.  Such a risk weighs in favor of settlement.  See In re Warfarin, 391 F.3d at 537.

> **f.  Ability of Defendants to Withstand a Greater Judgment**

"The seventh Girsh factor considers 'whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement.'"  Id. at 537-38 (quoting In re Cendant Corp., 264 F.3d at 240).  The record here does not demonstrate whether DuPont's ability to pay a greater judgment ever entered into the settlement negotiations.  The parties suggest that because the settlement is directed toward providing class members with injunctive relief, this factor should not be considered.  But given the hybrid nature of the relief offered under the proposed settlement, the Court concludes that consideration of this factor is appropriate.

Such an analysis is made difficult, however, given the lack of record evidence establishing DuPont's ability to withstand a greater judgement.  Thus, like the court in Wafarin, this Court concludes that this factor weighs neither for nor against

42

settlement.  See id.

> ### g.  Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and the Attendant Risks of Litigation

"The last two Girsh factors evaluate whether the settlement represents a good value for a weak case or a poor value for a strong case."  Id. at 538.  These factors ask courts to consider "reasonableness in light of the risks the parties would face if the case went to trial."  Id. (citing In re Prudential, 148 F.3d at 322).

Here, Plaintiffs' best possible recovery would be an injunction requiring DuPont to mitigate the release of PFOA into the municipal and private water supplies serving the class area. But as discussed, to establish an entitlement to such relief, Plaintiffs would need to demonstrate that they have suffered irreparable harm due to PFOA exposure.  Given the uncertainty of the research in this area, the Court finds that Plaintiffs would be faced with a difficult task.  If a jury credited the research cited by DuPont, Plaintiffs risk recovering nothing.

By contrast, the proposed settlement provides class members with real benefits.  And while a filter as to only one sink per household may appear to be limited relief when compared to the injunctive relief sought, this option would reduce class members' exposure to PFOA.  According to the Minnesota study identified by

class counsel, point of use filters, such as the one provided for under the settlement, "can serve as effective means of removing contaminants from water used for drinking and cooking in residential and commercial settings." See Blecher Decl. in Support of Preliminary Approval, Ex. 2 at 13.  As detailed in the study, the Culligan water system was the only [activated carbon] filter that met all target removal goals over the test life.  See id.  The study suggests that the Culligan filter would be effective in lowering PFOA contaminants for class members.

The settlement additionally provides for a minimum of ten replacement cartridges.  Given that the entire settlement amount here, less attorney fees and costs and claims administration expense, will fund class relief, the precise number of filters will depend on the number of class members submitting a claim. The Court notes that each filter has an average life of six months or up to 500 gallons of treated water.  See Blecher Decl. in Support of Preliminary Approval, Ex. 2 at 134 (noting that "[b]ased upon the results of this study those seeking treatment for PFC removal from their drinking water can be reasonably assured that all point-of-use devices evaluated [which included the Culligan filter]...will provide effective treatment when applied and used in accordance to manufacturers' specifications for up to 500 gallons of treated water.").

Thus, class members are guaranteed to receive at least five

44

and one half years worth of replacement filters.[27]  Although five
years may seem a limited window of relief when compared to the
injunctive relief originally sought by Plaintiffs, given the
risks of resolving this litigation on its merits, the Court finds
the relief offered under the settlement does provide a good value
to class members.  The Court further notes that replacement
filters for the system are available for approximately $35 each.
See Blecher Decl. in Support of Preliminary Approval, Ex. 5.
Thus, the filter system being recommended by counsel does not
leave class members with the burden of replacing filters that are
prohibitively expensive.

The filter option also allots class members $200 to pay for
professional installation of the system.  Based upon the parties'
submissions, this amount appears to be sufficient to accomplish
the task of installing the Culligan system on one sink per
household.[28]

Under the proposed settlement, class members are also being
offered the choice of accepting the cash equivalent of the filter
option, which class counsel reasonably values at "approximately

---

[27]The Culligan filter system appears to come with a starter
filter.  See Blecher Decl. in Support of Preliminary Approval,
Ex. 6.

[28]The Court also notes that class members who can install the
system without professional help may use the installation
allotment to purchase an additional five filters.

$800."[26]  This option is intended to account for class members
who already have a filter system, would prefer a different filter
system or prefer to drink bottled water.  Although providing
class members seeking injunctive relief with a cash payment may
be unorthodox, the Court finds that the payment option offered
here aims at accommodating class members' personal preferences
with regard to how they obtain their drinking water.  In other
words, the "incidental payment option" offers class members a
benefit incidental or secondary to the equitable relief provided
under the settlement.  Cf. Barabin v. Aramark Corp., Civil No.
02-8057, 2003 WL 355417, at *2 (3d Cir. 2003)(quoting Allison v.
Citgo Petroleum Corp., 151 F.3d 402, 415 (5th Cir. 1998))
(emphasis in original) ("Incidental damages are those 'that flow
directly from liability to the class as a whole on the claims
forming the basis of the injunctive or declaratory relief.'").
In light of the circumstances here, the Court finds that offering
class members a payment option is appropriate.

Thus, the Court finds that the proposed settlement affords
class members timely, tangible relief.  In light of the risk that
class members may receive no relief at all if this litigation

---

[26]Using class counsel's documentation, the filter option
could be valued at less than $800 ($110 for filter system + $200
for installation + 10 filters at $35 each = $660), but given the
various market factors that play into the purchase of such a
system, the approximate value of $800 appears reasonable.

were to continue, the Court finds that the proposed settlement relief is fair and reasonable.

     **g.**   **<u>Prudential</u> Factors**

The Court further notes that a number of the <u>Prudential</u> factors weigh in favor of accepting the proposed settlement.  <u>See</u> 148 F.3d at 323.  The record demonstrates that the scientific knowledge with regard to PFOA's environmental impacts remains unsettled.  Given that research in this area is still developing, this factor weighs in favor of accepting the settlement.  The fact that another court granted DuPont summary judgment on similar claims for public and private nuisance based on alleged PFOA contamination also weighs in favor of accepting settlement.  Moreover, class members were accorded the right to opt-out of this proposed settlement, another factor weighing in favor of the proposed settlement.

The Court further concludes that the proposed procedure for processing individual claims under the settlement is fair and reasonable.  Although the proposed settlement requires class members to submit a claim form to receive any benefit, class members will have received three, separate mailings alerting them to this fact:  (1) the class notice; (2) the letter from class counsel and (3) the claim form mailing.  The claim form mailing will include a "Frequently Asked Questions" form that provides

class members with a toll-free number for assistance.  Any amount remaining in the settlement fund after the claim period reverts back to class members in the form of either additional filters or cash payment.  The Court is confident that the claim procedure proposed is fair and reasonable.

In sum, the Court has carefully considered the requirements of Federal Rule of Civil Procedure 23(e), as well as the <u>Girsh</u> and <u>Prudential</u> factors, and finds the proposed settlement to be a fair, reasonable and adequate compromise of the class claims.

### E.  Attorney Fees

Class counsel ask the Court to approve an award of $2,766,390 in fees, or 33.33% percent of the settlement fund. Counsel also request reimbursement of $886,224.27 in expenses. Federal Rule of Civil Procedure 23(h) directs that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  The agreement proposed here authorizes payment of Plaintiffs' counsel fees and costs from the settlement fund.

The propriety of paying attorney fees from a common fund is well established.  See <u>Boeing Co. v. Van Gemert</u>, 444 U.S. 472, 480 (1980) ("Unless absentees contribute to the payment of attorney's fees incurred on their behalves, they will pay nothing

48

for the creation of the fund and their representatives may bear additional costs."); GMC Pick-Up Truck, 55 F.3d at 820 n.39 ("The common fund doctrine provides that a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees."). For all the reasons identified below, the Court finds that counsel's diligence in resolving this litigation has significantly benefitted the class. Counsel are thus entitled to a fee award.

To assess the reasonableness of a fee award in common fund cases, courts generally apply the "percentage of recovery" method. See id. at 821. Plaintiffs' counsel seeks an award of 33.33% of the total value of the settlement fund.[27] When analyzing the reasonableness of a fee request, courts consider several factors:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6)

---

[27]DuPont does not object to counsel's requested fee. But DuPont's lack of objection does little to assure the Court that counsel's request is reasonable. See In re Pet Food, 629 F.3d at 359 (Weis, dissenting)(citing GMC Pick-Up Truck, 55 F.3d at 819-20))("Defendants remained silent on the issue, likely because, as we have observed on a number of occasions, they were interested primarily in 'buying peace.'").

the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

In re Rite Aid Corp. Securities Litig., 396 F.3d 294, 301 (3d Cir. 2005)(quoting Gunter v. Ridgeway Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000)).  Of course, the Court's review is not limited to the "Gunter factors."  Other relevant factors include:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative" terms of settlement.

In re AT & T Corp., 455 F.3d 160, 165 (3d Cir. 2006)(citing In re Prudential, 148 F.3d at 338-40)(internal citations omitted). Indeed, the Circuit has directed courts to "consider the Gunter factors, the Prudential factors, and any other factors that are useful and relevant with respect to the particular facts of the case."  Id. at 166.

The Court need not apply these factors "in a formulaic way." Id. (quoting Rite Aid, 396 F.3d at 301).  Rather, "[w]hat is important is that in all cases, the district court 'engage[s] in robust assessments of the fee award reasonableness factors.'" Id. (quoting Rite Aid, 396 F.3d at 302); see also In re Pet Food, 629 F.3d at 361 (Weis, dissenting)(quoting In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 728 (3d Cir. 2001))(noting that the court must perform "extensive analysis and inquiry before

determining the amount of fees").  The Third Circuit also
recommends cross-checking any percentage award by applying the
"lodestar" award method, which is typically employed in statutory
fee-award cases.  See Gunter, 223 F.3d at 195.

> **1.   Size of the Fund Created and Number of Persons
> Benefitted**

The first Gunter factor requires the Court to consider the
fee request in comparison to the size of the fund created and the
number of class members to be benefitted.  When conducting this
analysis, courts may weigh the class benefit afforded under the
settlement against the percentage of the class members'
approximated, actual damages.  See Gunter, 223 F.3d at 199 n.5.
Generally, as the size of the common fund increases, the
percentage of the award that may reasonably be applied to
attorney fees decreases.  See In re Cendant Corp. PRIDES, 243
F.3d at 736.  The rationale for this sliding scale is that, in
most cases, the size of the award is more directly related to the
size of the class, not the efforts of counsel.  Id.

Counsel here negotiated an $8.3 million settlement fund to
benefit approximately 4,248 class households.  Although
Plaintiffs originally sought injunctive relief, the settlement
affords the class a hybrid of injunctive and monetary relief
valued at $800 per household.  The Court, again, notes that in
exchange for this benefit, class members release only nuisance

51

claims for injunctive relief.  Thus, the Court finds that the
settlement offers class members a significant benefit.  The
benefit afforded to class members under the settlement, however,
is not so large as to justify a reduction in the percentage of
fees requested by counsel.

> **2.   Absence of Substantial Objections by Members of
> the Class to the Settlement Terms and/or Fees
> Requested by Counsel**

A lack of class member objections to a fee request speaks to
the reasonableness of the fees requested.  See In re Rite Aid
Corp., 396 F.3d at 305.  The class notice issued here advised
class members that counsel would "ask the Court to approve
payment of their reasonable attorneys' fees and expenses related
to their work in these cases over the last approximately five
years."  See Byrne Decl. in Support of Final Approval, Ex. 1.
The Notice further instructed class members how to voice
objections to "any part" of the settlement.  Id.  The notice did
not, however, disclose the percentage of fees sought by
Plaintiffs' counsel, although the notice did disclose that any
payment to counsel would be taken from the $8.3 million
settlement.

As discussed, the Court finds that the low number of class
members choosing to opt out or object to the settlement
demonstrates that class members generally approve the settlement.

No class member has objected to the payment of fees and expenses from the settlement.[28]  But given that class members were not advised as to the size of counsel's fee request, the Court cannot find that the absence of objections demonstrates that counsel's fee request is reasonable.

### 3.   Skill and Efficiency of Counsel

Courts also consider counsel's skill and efficiency when considering awarding fees from a common fund.  See In re Rite Aid, 396 F.3d at 304.  During the course of this litigation, this Court has had many opportunities to observe counsel's performance, and the Court has found counsel to be highly competent.  Counsel succeeded in resolving this matter so as to provide a direct benefit to class members.  Indeed, counsel's skill is further evidenced by the settlement's flexibility to provide class members with options designed to accommodate household preferences.

In furtherance of its obligation to engage in extensive analysis and inquiry before determining a reasonable amount of fees, the Court required further submission from counsel explaining instances where multiple attorneys appeared on behalf of the class and clarifying billing entries.  The Court has

---

[28]   The Court notes that it received one, general objection to the payment of attorney fees from the settlement fund from a non-class member.  As previously discussed, the Court struck this objection.

53

thoroughly reviewed these materials and is satisfied that counsel efficiently managed this litigation.

The complex issues raised in this litigation required counsel with numerous areas of expertise.  Effective and efficient representation of the class required specialized understanding of on-going scientific, regulatory, political/legislative and legal developments associated with human exposure to PFOA in residential drinking water.  Counsel allocated specific groups of tasks to different firms, according to each firm's expertise.  For example, tasks were allocated according to a firm's prior experience handling PFOA blood and water sampling tasks, deposing certain experts or handling complex electronic discovery.  As a result of this delegation plan, multiple appearances by class counsel were sometimes necessary when an issue affected areas being handled by different counsel.

Moreover, the Court required such further submissions by counsel so that the Court could conduct a more meaningful lodestar cross check analysis.  Counsel has allayed the Court's concern regarding the efficient representation of the class.  As noted, the multiple appearances were appropriate.  Moreover, such multiple appearances were only a small percentage of counsel's total time.  Given that counsel seeks reimbursement for less than half the lodestar value of its time, even if the Court struck

every hour where more than one class attorney entered an appearance, such an adjustment would not affect the total requested by counsel.

After careful review, the Court finds that counsel has effectively and efficiently represented the class.  This factor weighs in favor of approving counsel's requested fees.

### 4.  Complexity and Duration of the Litigation

This factor requires the Court to consider the complexity, expense and duration of the litigation.  See In re Rite Aid, 396 F.3d at 305.  As in Rite Aid, the matters to be resolved here raised difficult questions of law and fact.  Counsel faced the serious challenge of establishing irreparable, class-wide harm based on PFOA exposure.  Over the past five years, counsel reviewed millions of documents, attended more than fifty depositions and engaged in extensive motion practice, including most recently a motion for summary judgment and seven motions in limine.  Cf. In re Cendant Corp. PRIDES, 243 F.3d at 735-36 (fee award not warranted where liability had been conceded, case was settled early in the litigation, the parties had engaged in minimal motion practice and limited discovery).  Indeed, counsel spent over 20,000 hours litigating these matters.  The Court finds that the complexity and duration of this litigation weigh strongly in favor of accepting counsel's fee request as

reasonable.

### 5.   Risk of Nonpayment

Class counsel undertook this class action on a contingency
fee basis.  Thus, for five years, counsel carried both the cost
of litigation and risk of not being paid for their services.  The
Court notes, again, that prior to settlement, a motion for
summary judgment was pending.  Even if counsel prevailed on this
motion, and the matter proceeded to trial, counsel still risked
recovering nothing.

This risk existed not because there was any danger that
DuPont could not satisfy a judgment, which might otherwise weigh
in favor of accepting a fee request as reasonable.  See Yong Soon
Oh v. AT & T Corp., 225 F.R.D. 142, 152 (D.N.J. 2004)(considering
the risk of non-payment by the defendant).  Rather, counsel faced
significant challenges in terms of establishing liability and a
right to injunctive relief.  Despite the risk that counsel's
significant time and efforts could go uncompensated, counsel
diligently prosecuted the class members' claims.  See In re AT &
T Corp., 455 F.3d at 171 (agreeing that where counsel accepted
class action on contingent basis and maintained "vigor and
dedication" throughout litigation, the risk of non-payment
weighed in favor of approving counsel's fee request).  Thus, the
Court finds that this factor weighs in favor of accepting

counsel's fee request.

### 6.    Amount of Time Devoted to the Case by Counsel

Counsel has expended over 20,000 hours.[29]  This total does not include the fees relating to the class representatives' individual claims, for which counsel rightly does not seek reimbursement.  The declarations submitted in support of counsel's request demonstrate that counsel appropriately spent time preparing for and attending court hearings and conferences, researching and drafting motions, reviewing and responding to discovery requests, preparing for and taking depositions, negotiating settlement, issuing the class notice and responding to class members' requests for information.

The Court also required counsel to clarify certain aspects of counsel's declarations submitted in support of the motion for fees and costs.  Upon careful review of both counsel's initial motion and this additional submission, the Court is satisfied that counsel spent its time judiciously.  Thus, this factor weighs in favor of approving counsel's fee request.

### 7.    Awards in Similar Cases

When considering the reasonableness of a fee request, courts look to awards approved in similar cases.  See GMC Pickup Truck,

_____

[29]The Court notes that this total has risen since the Court required an additional submission to support counsel's fee request.

55 F.3d at 822 (recognizing that in common fund cases, fee awards can range from nineteen percent to forty-five percent of the settlement fund).  This factor is addressed in two ways: a court "(1) compares the actual award requested to other awards in comparable settlements; and (2) ensures that the award is consistent with what an attorney would have likely received if the fee was negotiated on the open market."  Dewey v. Volkswagen of Am., 728 F.Supp.2d 546, 604 (D.N.J. 2010).

Counsel argues that 33.33% falls within the accepted range of fees approved in common fund cases and is consistent with a privately negotiated fee in the marketplace.  See Hall v. AT & T Mobility LLC, Civ. No. 07-5325, 2010 WL 4053547, at *21 (D.N.J. 2010) ("The requested fee of 33 1/3 % is also consistent with a privately negotiated contingent fee in the marketplace.").  Counsel, however, fails to identify comparable awards based on similar settlements.  Thus, the Court does not find that this factor weighs in favor of accepting counsel's requested fees.

### 8.  **Prudential** Factors

Several additional factors identified by the Third Circuit also weigh in favor of approving a 33.33% award.  See In re AT & T Corp., 455 F.3d at 165 (citing In re Prudential, 148 F.3d at 338-40).  The value of the benefits accruing to class members are attributable to the efforts of counsel.  Cf. In re Pet Food, 629

F.3d at 362 (Weis, J. dissenting) ("Counsel should not charge the class for acquiring evidence of culpability by piggy-backing on the criminal and agency proceedings."). And as discussed, the percentage requested is consistent with a privately negotiated contingent fee in the marketplace. The Court also credits counsel with designing an innovative settlement, designed to suit class member preferences for how they obtain drinking water.

### 9. Lodestar Cross Check

The Court further notes that counsel's requested fees are supported by the lodestar cross check. See In re AT & T Corp., 455 F.3d at 164. Courts perform the cross-check "by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." Id. "The multiplier is a device that attempts to account for the contingent nature or risk involved in a particular case and the quality of the attorneys' work." Id. n.4 (quoting Rite Aid, 396 F.3d at 305-06 (footnote omitted)). The Third Circuit has recognized that "[m]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied...." In re Prudential, 148 F.3d at 341. In conducting the cross-check, the Court need not aim at "mathematical precision," nor must the Court conduct a full lodestar analysis. In re AT & T Corp., 455 F.3d at 169 n.6 (citing Rite Aid, 396 F.3d at 306-307).

Although only seeking an award totaling $2,766,390, counsel approximates their actual fees at $6,670,000 million. Applying the cross-check results in a multiplier of 0.41. Given that the multiplier is less than 1, the Court finds the cross-check further evidences the reasonableness of counsel's requested fees. See Hall, 2010 WL 4053547, at *22 (recognizing a multiplier of "less than one" as reasonable).

- In sum, the Court finds that the majority of Gunter and Prudential factors weigh in favor of approving counsel's fee request. Given the length and complexity of this litigation, as well as counsel's significant efforts on behalf of the class, the Court finds an award of 33.33% to be reasonable.

To ensure that class claims are efficiently managed, however, the Court will withhold 5% of the fee award. DuPont is hereby directed to deposit this amount with the Clerk of the Court, to be held in an interest-bearing escrow account. Upon the receipt of a certification from Plaintiffs' counsel stating that all claims have been processed, the Court will order these funds released.

### 10. Expenses

Counsel also requests reimbursement of $886,224.27 in expenses. "Expenses are recovered if they are adequately

documented and reasonable in nature." <u>Hall</u>, 2010 WL 4053547, at *23 (citing <u>In re Safety Components, Inc. Sec. Litig.</u>, 166 F.Supp.2d 72, 108 (D.N.J. 2001)).  The Court notes that counsel discounted certain expenses that benefitted the representative plaintiffs individual claims by 25%.  The Court finds this adjustment to be appropriate and concludes that counsel's expenses are reasonable.

## IV. Conclusion

The Court finds the proposed settlement agreement to be a fair, reasonable and adequate resolution of the class claims. The Court further approves counsel's request for $2,766,390 in legal fees and $886,224.27 in expenses for all the reasons set forth herein.  An appropriate Order will issue this date.


Dated: <u>August 26, 2011</u>        <u>s/Renée Marie Bumb</u>
                                 RENÉE MARIE BUMB
                                 UNITED STATES DISTRICT JUDGE